## Richmond

VIRGINIA DEPARTMENT
OF CORRECTIONS, ET AL.

V.

JAMES T. CLARK, JR.

Record No. 830584.

June 15, 1984.

Present: All the Justices.

*Jacqueline G. Epps, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General,* on briefs), for appellants.
*Jaclyn Leonard (Robert T. Hall; Hall, Surovell, Jackson & Colten, P.C.,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

The dispositive question in this habeas corpus appeal is whether trial counsel's representation of James T. Clark, Jr., during the penalty phase of his capital murder trial, constituted ineffective assistance of counsel.

I

On August 29, 1978, a jury convicted Clark of capital murder for willful, deliberate, and premeditated killing for hire, Code § 18.2-31(b). Following a separate penalty proceeding, pursuant to Code § 19.2-264, the jury determined that Clark's conduct in committing the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind or aggravated battery to the victim," and fixed his punishment at death.

On November 21, 1978, after conducting a sentencing hearing, the trial court imposed the death sentence. On appeal, we found no reversible error in Clark's conviction and sentence. In compliance with Code § 17-110.1C, we also concluded that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that it was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We, therefore, affirmed the judgment of the trial court. *Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S. 1049 (1980).

Thereafter, Clark filed a petition for a writ of habeas corpus in the court in which he had been tried and convicted of capital murder. After an evidentiary hearing before the same judge who presided at the murder trial, the habeas court found, *inter alia,* that "[t]rial counsel failed to adequately and properly investigate, de-

velop, consider, and present lay and psychiatric evidence in mitigation of the death penalty," adding that "[c]ounsel's performance in this regard was not within the range of competence demanded of lawyers in criminal cases."

Whereupon, the habeas court granted the writ with respect to Clark's sentence only, and purportedly commuted his sentence to life imprisonment.[1] This appeal ensued.

## II

In the guilt stage of the trial, the evidence established that George Harold Scarborough was found dead in his home. His death was the result of five gunshots to his head and chest. Clark was arrested and confessed to the murder.

Clark and his cousin, Charles Daniel Stewart, were hired to kill Scarborough for $7,000. They broke into Scarborough's home and ransacked the residence, simulating a burglary. While waiting for Scarborough to arrive, they planned their attack and ate and drank from their victim's refrigerator.

Upon Scarborough's arrival, Stewart, armed with a knife, grabbed Scarborough and tried to chloroform him. Scarborough broke free, and Clark, armed with a gun, ordered him to cease resisting. When Scarborough continued to struggle, Clark "shot him at pointblank" range five times, using a pillow to muffle the noise.

Clark then removed $435 from the deceased's back pocket, and he and Stewart departed, taking the money and other items of personal property. The two men joined their girl friends and celebrated Scarborough's murder.

At the penalty stage of the trial, Clark's counsel presented mitigating evidence consisting of the testimony of Clark's parents. James Clark, Sr., testified that his son was a fairly normal child until age nine when he was accidentally burned "over forty percent of his body." As a result, he was hospitalized for approximately eight months, receiving intensive treatment. According to his father, Clark's "whole character changed" after this incident. He lost interest in school and began to have "some legal problems."

---

[1] Appellants also contend that, even if the habeas court correctly granted the writ, it erred in commuting Clark's sentence to life imprisonment. In view of our holding respecting effective assistance of counsel, we need not address the validity of this ruling.

Clark's mother and father separated when he was three years old. His paternal grandmother "raised him until he was seven." Thereafter, he lived with either his father, his mother, or his grandmother.

Clark's mother testified that her son "was normal until he was burnt." She said that he was "pampered a lot" while in the hospital, but she didn't really notice any personality changes after the accident. She further stated that she never observed anything about her son which would suggest he had a violent nature. She acknowledged, however, that although Clark had lived with her from approximately age 14 to 17, he had not resided with her for the five years immediately preceding Scarborough's murder.

## III

At the habeas hearing, Clark's parents testified more extensively concerning his background. Clark was an unwanted child, born when his mother was 15. She frequently left her husband and children for varying time periods and eventually left permanently to live with a married man. Following their parents' divorce, Clark and his brother John, who was 13 months younger than Clark, lived mostly with their paternal grandmother. They, however, did visit their mother occasionally.

Clark's mother later became a prostitute in the District of Columbia. The two boys stayed with her at times during this period and were subjected to the influence of a "madam" named Lil and a professional gambler with whom their mother was involved.

When Clark was nine years old, his mother was injured in an automobile accident, and he and John went to live with their father. A short time later, Clark was playing with a model airplane, which exploded, burning him severely. His brother saved Clark's life by pushing him into a swimming pool.

During the next eight months, Clark received treatment for his burns in several hospitals. His wounds became infected and maggot-infested. He suffered greatly during this period, and to ease his pain, he received doses of morphine regularly. Clark sustained extensive permanent scars from the burns.

Shortly after he was released from the hospital, Clark's mother remarried and moved to Maryland. The marriage failed, and his mother became involved in a lesbian relationship. During this period, Clark and his brother lived with their mother intermittently.

When the lesbian relationship ended, Clark's mother attempted suicide. Clark and his brother found her in a coma. While his mother convalesced, Lil cared for the two boys. She gave them money and clothes and purchased an automobile for John, although he had not reached the legal driving age. Lil and John became lovers.

Clark and his brother always had a close relationship. When John was 17, he enlisted in the Army for six months, and following his discharge, he was murdered. His murderer was not discovered, and Clark swore to avenge his brother's death.

Several other witnesses testified at the habeas hearing, including one of Clark's Maryland neighbors, a principal at a school Clark attended, and one of Clark's former elementary teachers. The thrust of their testimony was that Clark lacked supervision and his mother showed little concern for his welfare.

Dr. Richard Saunders, a clinical psychologist, and Dr. John Follansbee, a psychiatrist, also testified at the habeas hearing. Dr. Saunders administered a series of tests to determine Clark's intelligence, the possibility of brain damage, and his personality assessment. He concluded that Clark was of average intelligence and had no brain damage. He also considered Clark's history in assessing his personality.

Dr. Saunders described Clark as "a dictatorial kind of person," who was "especially willing to admit to material about himself that is markedly socially deviant, antisocial, in many cases aggressive. . . ." He found that Clark had a "negativistic" attitude toward authority, and he "has apparently been acting in a very antisocial way since age ten."

Dr. Saunders was unable to detect that Clark had experienced "any significant emotional impact of the loss of his brother or of the experience he had in being burned." He described Clark's morality as "very primitive," and diagnosed Clark as an "[a]ntisocial personality." When asked if, based on his findings, people could conclude that Clark is extremely dangerous, Dr. Saunders replied, "[t]hey certainly could." He added that "if [people] are counting on him to restrain himself from illegal behavior, they would be making a mistake," and that Clark was capable of killing again for money.

Dr. Follansbee could obtain only a "sparse and fragmentary" history from Clark. He opined that Clark's personality was damaged during the first three years of his life, due to deprivation and

instability. He described Clark as "one of the more serious antisocial personalities that I've seen," and he believed that Clark is incapable of dealing in moral concepts. Like Dr. Saunders, Dr. Follansbee also stated that Clark is a very dangerous person, capable of killing for hire again.

Clark called a practicing trial lawyer licensed in the Commonwealth as an expert witness. The expert opined that in every capital murder case, defendant's counsel has a duty to investigate and consider using psychiatric evidence in mitigation of punishment if the evidence tends to show the defendant's mental abnormality. According to the witness, failure to do so constitutes ineffective assistance of counsel. Summarizing his thoughts on the subject, he said:

> So there is no excuse in any capital case not to have a psychiatric evaluation of the defendant for the purpose of establishing mitigating mental abnormalities to put into the trial at sentencing.
>
> Now, I would add that because you have the evaluation doesn't mean that that information is going to be presented. It may be, on balance, it may do more harm than good. But there is never an instance, in my opinion, that a reasonably competent lawyer would fail to have the evaluation.

Clark's trial attorneys testified that Clark was neither helpful nor cooperative. It was difficult to obtain background information from him. Moreover, throughout the proceeding, Clark expressed a desire to be executed.

He did furnish his attorneys with the names of eleven potential witnesses to be called in mitigation. However, his attorneys concluded that the Commonwealth could elicit damaging evidence from most of the witnesses about Clark's callous attitude immediately following the murder.

The attorneys ultimately decided to use Clark's parents in mitigation because they were most likely to arouse the sympathy of the jury. Explaining their decision to rely solely upon Clark's parents as mitigating witnesses, one of his attorneys said, "if the jury in my opinion is going to have any sympathy for anybody, it is going to be the parents of the [individual] involved," and that they "would be the least likely subjects for cross-examination. . . ."

Clark's other attorney also shared that view saying:

> there was no way on the face of this earth that anyone on the jury was going to feel compassion for Mr. Clark, based on the crime he had committed.
>
> The only thing they were going to feel compassion for, was, again, maybe someone, just one person would have felt compassion for his mother and father.

Both attorneys stated categorically that they would not have used the reports or testimony of Doctors Saunders and Follansbee if it had been available to them at trial. It was their considered judgment that the doctors' opinions (that Clark was extremely dangerous and likely to kill again) would be very damaging before the sentencing jury.

## IV

■ The right to counsel which is guaranteed by the Sixth Amendment to the Federal Constitution and made applicable to the States through the Fourteenth Amendment includes the right to effective assistance of counsel. *McMann* v. *Richardson*, 397 U.S. 759, 770-71 (1970); *Gideon* v. *Wainwright*, 372 U.S. 335, 344 (1963). To be effective, an attorney must exercise "the care and skill which a reasonably competent attorney would exercise for similar services under the circumstances." *Stokes* v. *Warden*, 226 Va. 111, 117, 306 S.E.2d 882, 884 (1983).

Just a month ago, and since this case was briefed and orally argued, the United States Supreme Court rejected a defendant's claim that his trial counsel was ineffective because counsel did not properly investigate and present mitigating evidence in a death penalty case. *Strickland* v. *Washington*, 104 S.Ct. 2052 (1984). In *Strickland*, the defendant pleaded guilty to three capital murder charges. During the plea colloquy, the defendant told the trial court that at the time of his criminal spree he was under extreme stress caused by his inability to support his family. While preparing for the sentencing hearing, his trial counsel spoke with the defendant about his background. He also spoke on the telephone with the defendant's wife and mother, but he never met with them personally. Counsel did not otherwise seek out character witnesses or request a psychiatric examination. *Id.* at 2057.

His decision not to present evidence concerning the defendant's character and emotional state reflected his judgment that it was better to rely solely upon the plea colloquy, thereby depriving the prosecution of the opportunity of cross-examining the defendant and of presenting psychiatric evidence of its own. *Id.* The Court held that counsel's conduct fell within the range of reasonable competence and that the defendant failed to prove prejudice. *Id.* at 2059.

In determining whether an attorney's performance in a given case meets the "reasonable competence" standard, a court should make every effort "to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." *Strickland* at 2065. Moreover, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 2066. In other words, the court will presume that counsel's conduct is the product of reasonable trial strategy and it is the defendant's burden to overcome this presumption. *Id.*

Furthermore, the Constitutional standard for effective assistance of counsel is no more stringent in capital cases than in those where less severe punishments may be imposed. However, the seriousness of the offense and the severity of the punishment are factors which must be considered in assessing an attorney's performance. *Stanley* v. *Zant*, 697 F.2d 955, 962 (11th Cir. 1983); *Proffitt* v. *Wainwright*, 685 F.2d 1227, 1247 (11th Cir. 1982), *cert. denied*, 464 U.S. 1003 (1983); *Washington* v. *Watkins*, 655 F.2d 1346, 1357 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982).

To furnish effective representation, counsel must conduct a reasonable amount of pretrial investigation so that his decisions at trial will reflect informed deliberation. The amount of investigation that is "reasonable," however, cannot be measured precisely. It necessarily depends upon various factors, including the number and relative complexity of the issues in the case, the strength of the prosecution's case, and the overall strategy of counsel. *Watkins*, 655 F.2d at 1355-56.

Although the court below found that trial counsel failed to "properly investigate, develop, consider, and present lay and psychiatric evidence in mitigation of the death penalty," a fair reading of its opinion indicates that its chief criticism of trial counsel

was focused on the absence of psychiatric evidence. In that regard, the court stated:

> [c]ounsel did not follow up on the psychiatrist's recommendation that there be a full exam—even in the face of Petitioner's bizarre behavior. *The key mitigating factor which defense counsel left uncovered at trial and which the exam would have revealed was that Petitioner's anti-social personality was disabling and that it was the result of factors beyond his control.*

(Emphasis added.)[2]

It is true, as the trial court noted, that Dr. Fink, who examined Clark prior to trial, suggested that Clark be given a thorough examination of his "mental and emotional condition" before trial. Likewise, it is reasonable to conclude that had the more extensive examination been made, it would have revealed the information which was furnished later by Doctors Saunders and Follansbee. Therefore, we will assume, without deciding, that trial counsel failed to investigate Clark's "mental and emotional condition."

This, however, does not end our inquiry. Clark "not only has the burden of proving ineffective assistance of counsel, but also must prove actual prejudice as a result." *Stokes*, 226 Va. at 118, 306 S.E.2d at 885. *See also Slayton* v. *Weinberger*, 213 Va. 690, 692, 194 S.E.2d 703, 705 (1973).

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment . . . . Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland*, 104 S.Ct. at 2067. Thus, when counsel's performance is deficient, a defendant must establish that it "actually had an adverse effect on the defense," *id.*, and when a court makes the prejudice inquiry, it "must ask if the defendant has met the bur-

---

[2] The court, however, also recognized that both trial counsel were "distinguished, competent, and conscientious members of the Bar who have given of their time unselfishly in this case and in other court-appointed cases. They are skilled in the practice of criminal law."

den of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* at 2069.

As previously noted, both Dr. Saunders and Dr. Follansbee testified that Clark was extremely dangerous and capable of killing again. Quite obviously, the trial court agreed with their opinions because, in purporting to commute Clark's sentence to life imprisonment, the trial judge stated that he "strongly and fervently recommends and prays that the Petitioner not be paroled and that his sentence truly be imprisonment for the rest of his life."

At trial, the Commonwealth sought and obtained the death penalty on the ground that Clark's "conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4C. This is the so-called "vileness" condition.

The death penalty also can be imposed if the jury believes beyond a reasonable doubt "that there is a probability *based upon evidence of the prior history of the defendant* or of the circumstances surrounding the commission of the offense of which he is accused *that he would commit criminal acts of violence that would constitute a continuing serious threat to society*." Code § 19.2-264.4C. (Emphasis added.) This is known as the future "dangerousness" condition.

Clark's trial attorneys testified that, had they obtained the reports of Doctors Saunders and Follansbee, they would not have presented them to the jury. Explaining why he would not have used these reports, one of Clark's trial attorneys said, "those two reports . . . in my opinion lead you into . . . another problem that you face under the statute . . . whether or not this man was a danger to the community . . . and could kill again." The attorney further stated, "I would not use them today, let alone use them [at trial], even knowing what I know now, I still would not use them."

Clark's other attorney expressed a similar view regarding the impact this testimony would have had on the jury. He said, "I think . . . the psychiatric report brings out that, unfortunately, Jimmy Clark is . . . apparently a serious threat to society. . . . I don't think now, and I wouldn't have thought then that that would have helped Jimmy Clark."

We agree that the testimony of Doctors Saunders and Follansbee would have presented evidence supporting the potential

"dangerousness" circumstance for imposing the death penalty—a condition which, according to the judgment of the Commonwealth's Attorney and the jury's verdict, had not been established at trial. Therefore, even if Clark's attorneys should have made further investigation into Clark's mental and emotional condition, their failure to do so, under the circumstances of this case, did not result in any prejudice to Clark.

## VI

Clark also contends that his trial counsel failed to properly investigate, develop, consider, and present in mitigation the lay evidence which was later presented in his habeas hearing. The evidence which he now suggests should have been presented at the penalty phase of his trial tended to show that he was an unwanted and neglected child who was subjected to unhealthy and immoral influences. This evidence focused largely upon Clark's mother who was portrayed as irresponsible, immoral, and selfish. She was a prostitute, had a lesbian affair, and twice attempted suicide. Clark and his brother lived for a time with their mother's "madam." It is not an overstatement to describe Clark's part-time living arrangements as sordid.

At the time of the trial, however, Clark's counsel did not know many of these facts. Clark was a recalcitrant client, uncooperative with his lawyers and adamant in his desire to be executed. Not only did he fail to reveal much of his personal history to his lawyers, he likewise was very noncommunicative with Dr. Follansbee, despite his habeas counsel's urging to cooperate.

An attorney's tactical decisions are necessarily influenced by information supplied by his client. "In particular, what investigation decisions are reasonable depends critically on such information . . . [a]nd when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland* at 2066. *See also U.S. v. Decoster*, 624 F.2d 196, 209-10 (D.C. Cir. 1976). It also should be noted that, although Clark's trial attorneys interviewed his mother on at least two occasions before she testified, she never revealed her sordid past to them. She came forward with these facts only after her son had been sentenced to die.

Clark was guilty of a most heinous crime. He brutally murdered a man he did not know, for money and the thrill of killing.

He has never shown any remorse for his wicked deed. Justice Harrison, speaking for a unanimous court in Clark's capital murder appeal, observed:

> Here the defendant had days during which he planned and prepared for a murder for hire. Clark and Stewart were fulfilling a contract and doing it in a careful, deliberate, and dispassionate manner. They had a job to do, for an agreed price, and they succeeded. But Clark and Stewart were not content with the $1,200 they had gotten or the $5,800 they were to receive. They robbed the corpse of an additional $435. They consumed the victim's food, stole his possessions, and celebrated his murder with their girl friends. They even called their coconspirator to announce, "The beast is deceased." Certainly, in no other case that we have reviewed is more callousness exhibited by the murderers.

*Clark,* 220 Va. at 217, 257 S.E.2d at 794.

 Faced with these facts, counsel determined that Clark's only hope for arousing the sympathy or compassion of even a single juror[3] would be through the testimony of his parents. Counsel decided little was to be gained by the testimony of Clark's friends because they were vulnerable to damaging cross-examination.

At the habeas hearing, one of Clark's trial attorneys, explaining his theory of mitigation, stated:

> that perhaps there was someone on the jury that would I guess feel more sorry for his mother and father for having a boy that for a number of years who could generally be described as a good kid. I use the word kid, but a good child, and then there was a time when he was involved in an incident involving burns where, as a result of that he was hospitalized, and as a result of that there was some change in his behavior.

Viewing all the circumstances as they appeared to trial counsel at that time, we believe this was a most rational and reasonable tactic. Moreover, if the purpose of the parents' testimony was to

---

[3] Code § 19.2-264.4E provides that "[i]n the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life." Therefore, a single juror can prevent imposition of the death penalty.

arouse sympathy, clearly, an attack upon the mother's character would have been ill-advised. It also should be noted that much of the lay testimony elicited at the habeas hearing was background information for the psychiatric experts, and, as we previously have stated, the psychiatric evidence most likely would have portrayed Clark as a continuing threat to society.

█ Although a defendant in a capital case has the constitutional right to present virtually unlimited evidence in mitigation, *Lockett* v. *Ohio*, 438 U.S. 586 (1978), trial counsel has a tactical responsibility to determine the extent of such evidence to be presented. Consequently, "the posture of a given case may well justify, if not require, an effective attorney to *refrain* from presenting such evidence." *Stanley* v. *Zant*, 697 F.2d at 961. Referring to lay testimony in mitigation of punishment, the Eleventh Circuit further noted: "In many cases, counsel could reasonably conclude that such evidence would be of little persuasive value or that it would cause more harm than good by opening the door for harmful cross-examination or rebuttal evidence." *Id.* at 965.

We are of opinion that Clark received effective assistance of counsel during the penalty stage of his trial. We hold, therefore, that the trial court erred in granting the writ of habeas corpus. Accordingly, the judgment of the trial court will be reversed and vacated, the sentence of death previously imposed and approved shall remain in effect, and the trial court will be directed to fix a date for Clark's execution.

*Reversed and final judgment.*