## Director of the Department of Corrections

v.

## Joseph Jones

Record No. 840326

Decided April 26, 1985, at Richmond

Present: All the Justices

*Linwood T. Wells, Jr., Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellant.
*William H. Harris (Harris & Harris, P.C.*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is a habeas corpus proceeding filed by Joseph Jones who contends he was prejudiced in his 1980 criminal trial because his attorney failed to object to an instruction which had been ruled unconstitutional in *Sandstrom* v. *Montana*, 442 U.S. 510 (1979). Our decision is controlled by the recent case of *Stokes* v. *Warden*, 226 Va. 111, 306 S.E.2d 882 (1983).

In June of 1979, the Supreme Court in *Sandstrom* held the Due Process Clause of the Fourteenth Amendment was violated by an instruction providing " 'the law presumes that a person intends the ordinary consequences of his voluntary acts.' " 442 U.S. at 512. In February of 1980, a robbery occurred at Buddy's Superette in King George County. In April of 1980, appellee Jones was indicted in the court below for the robbery, use of a sawed-off shotgun while committing robbery, and use of a firearm while committing robbery. Jones defended the charges on the ground he was involuntarily intoxicated at the time of the crimes. Following a jury trial in August of 1980, Jones was convicted of the offenses and sentenced by the court to serve a total of 51 years in the penitentiary. We denied Jones' direct appeal in May of 1981. 221 Va. cviii.

In October of 1982, Jones filed the present petition for a writ of habeas corpus in the original jurisdiction of this Court naming the Director of the Department of Corrections as respondent. Jones alleged, among other things, that his trial attorney was ineffective because he failed to object to instruction 3 given at his criminal trial as follows: "Every person is presumed to intend the natural and probable consequences of his acts." We ordered the court below to determine the issue of ineffective assistance of counsel as alleged in the petition. Following a nonevidentiary hearing, the trial court ruled in favor of Jones and granted the petition for a writ of habeas corpus in a December 1983 order from which we awarded this appeal.

On behalf of the Director of Corrections, the Attorney General concedes that instruction 3 was unconstitutional and that trial counsel was ineffective because he failed to object to the erroneous instruction. In *Stokes*, also a habeas corpus proceeding involving a *Sandstrom* instruction, we determined the instruction was erroneous and that trial counsel in *Stokes* was ineffective in failing to object to the instruction.

There, we said that a finding that counsel was ineffective "does not necessarily mean a writ should be granted." 226 Va. at 118, 306 S.E.2d at 885. Noting that a petitioner "has a substantially heavier burden on collateral attack than on direct appeal," we stated that "[i]n a collateral attack, a prisoner not only has the burden of proving ineffective assistance of counsel, but also must prove actual prejudice as a result." *Id.*, 306 S.E.2d at 885. We held that the alleged error should be evaluated on habeas " 'in the total context of the events at trial,' " *id.* at 119, 306 S.E.2d at 886, *quoting United States* v. *Frady*, 456 U.S. 152, 169 (1982), and that "the issue in a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *Stokes*, 226 Va. at 119, 306 S.E.2d at 886, *quoting Henderson* v. *Kibbe*, 431 U.S. 145, 154 (1977). Indeed, the "ultimate focus of the inquiry" in the collateral proceeding is to determine whether the criminal trial was "fundamentally unfair" to the prisoner. *Strickland* v. *Washington*, 104 S.Ct. 2052, 2069-71, (1984). *See Va. Dept. of Corrections* v. *Clark*, 227 Va. 525, 533-37, 318 S.E.2d 399, 403-05 (1984).

Consequently, the sole question in this case is whether the convict carried his heavy burden to establish actual prejudice. Resolution of this issue requires examination of the evidence presented during the criminal trial.

During the morning of February 21, 1980, Jones, previously convicted of four felonies, and several male companions travelled by automobile from Washington, D.C., to King George County. About 9:30 a.m., three of the men, including Jones, drove to the scene of the robbery. While Jones either waited outside the store or was present inside the store near the front door, another of the trio "pulled out" a pistol and ordered the manager, as well as about 20 other persons, into a "walk-in" freezer. After money was removed from the store's cash registers, the men returned to their automobile. A few minutes later, a customer entered the store, unaware of the robbery, and eventually walked to a position be-

hind Jones, who had returned to the store and was in the process of removing bottles of wine from a display case. Dropping some of the bottles upon being surprised by the customer's presence, Jones pointed a sawed-off shotgun at the customer, ordered him to "be cool," walked to the front of the store, "looked outside," and left the store a few minutes later. Later that day, the men were apprehended, carrying the fruits of the crime, after they had driven across the Potomac River Bridge into Maryland.

Jones' defense of involuntary intoxication was based on the claim that he had been furnished contaminated marijuana during a momentary roadside stop en route from the District of Columbia to the scene of the robbery. He claimed that he became violently ill and unable to recall any of the events after the stop until he was in custody of Maryland authorities later in the day. Several witnesses for the prosecution testified about Jones' condition during and after the robbery.

The customer who met Jones at the wine display testified that he observed Jones from a distance of about two feet. Jones spoke with "assurance and demand" and "had a rather harsh, rapid tone in his voice." The witness noticed no peculiar odor about Jones' person and stated Jones walked "carefully" to the front of the store. Asked about the condition of Jones' eyes, the witness responded, "[n]ormal."

The store manager testified that about 30 minutes before the robbery, Jones entered the store and asked to use the rest room. The manager observed Jones from a distance of about two feet and testified his eyes and speech were "normal." The manager observed Jones walk the distance to and from the toilet and testified he walked normally. According to the manager, there was no peculiar odor about Jones' person, he did not appear to be ill, and there was no indication Jones had been ill prior to that time. The manager observed Jones again moments before the robbery when he offered to pay for gasoline for the automobile. At that time, Jones appeared "normal."

The store cashier testified she observed Jones when he entered the store to use the bathroom. She was about six feet from Jones and testified his speech was "clear," his eyes were "ordinary," he moved "in an ordinary walk," he had no peculiar odor about him, he did not appear to be ill, and there was nothing about his person which showed he might have been ill prior to coming to the store. The cashier again observed Jones just before the robbery as he

stood near the front door and noticed nothing unusual about him at that time.

A Virginia State Trooper, who followed the vehicle in which Jones was riding across the bridge and who assisted in the apprehension, testified Jones exited the stopped vehicle "under his own power" without any difficulty in walking. He stated Jones did not stumble, stagger, or weave as he moved and that Jones spoke with no difficulty, in a clear, audible voice. The trooper stated, however, that Jones "was quite uncooperative" when given orders, that he questioned "each and every verbal command," and that he said "he didn't know what [the apprehension] was all about . . . ." The officer testified Jones did not appear ill and had no odor of marijuana about his person. He stated there was nothing in Jones' behavior or demeanor that would lead him to believe that Jones was under the influence of marijuana or any other narcotic. Other police officers who observed Jones, when he was being interrogated during mid-afternoon of the day of the crimes by Maryland authorities, testified Jones appeared normal and gave intelligible, "straightforward" answers to questions.

Jones and his brother, Ronald Hinton, testified for the defense. Approximately two weeks before Jones' trial, Hinton had been convicted for his participation in the robbery. Hinton testified that after the group entered Virginia on the day of the robbery, they stopped because of car trouble. While stopped, one of the group handed Jones a marijuana cigarette, which Jones smoked. Jones then became ill, "threw up," and "was out of his head . . . mumbling things and saying kill this and kill that . . . ." Hinton testified that he believed the marijuana smoked by Jones "was treated with something."

Jones testified that he came to Virginia on the day in question because he had been informed there were "some people" in King George County selling marijuana "rather cheaply." Jones testified that he had smoked one marijuana cigarette "on the way down" from Washington and that he was handed another "joint" when the group stopped because of car trouble. According to Jones, his stomach "just started jumping-like." He stated, "this stuff just shot up my neck and out of my throat, and I bent over." His head felt "large" and "was beating-like." He had a "funny pain" in his stomach and he "just sat there and leaned on the car for a moment or two." Jones testified that he recalled nothing else until "waking up" in a Maryland jail. On cross-examination, Jones ad-

mitted smoking the marijuana cigarettes voluntarily and admitted stating to a physician four months after the robbery that, during the morning of the day of the crimes, he smoked the "two joints," one of which he "thought" had been "laced with Angel Dust or something of that sort" and that he "drank a half a cup of rum or something like that." In rebuttal, the State Trooper testified that, upon arrest of the four robbery suspects at the bridge, one of Jones' companions possessed a quantity of green plant material which, upon analysis, proved to be marijuana. The report of analysis does not indicate the marijuana was contaminated.

█ We reject Jones' contention that he was actually prejudiced by instruction 3. There was clear, cogent, and overwhelming evidence presented at the criminal trial to support, beyond any doubt, the conclusion that Jones was guilty of the offenses charged, either as a principal in the first or second degree. Positive, eyewitness testimony placed him at the scene of the crimes at the time they were committed and established his active participation. Jones did not claim he was absent when the offenses were committed. Instead, he only says that he was *involuntarily* intoxicated and that he does not remember. He now argues that there was "no evidence of intent or at the very least conflicting evidence on the issue of intent." Thus, he says, the jury may have relied on the presumption stated in instruction 3, rather than the evidence, to find he had the requisite intent to commit robbery. That contention will not survive close scrutiny.

The constitutional vice in a *Sandstrom* instruction is that it creates either a conclusive presumption, which conflicts with the overriding presumption of innocence, or a presumption shifting the burden of persuasion to the defendant. *Sandstrom*, 442 U.S. at 523-24. A *Sandstrom*-type presumption does not operate independently of the evidence but functions as follows: It "informs the jury that once a party has proved A, the basic fact, the jury can or must presume B, the presumed fact." *Connecticut* v. *Johnson*, 460 U.S. 73, 96 (1983) (Powell, J., dissenting) (footnote omitted).*

---

* In *Connecticut* v. *Johnson*, a plurality held that an instruction given in violation of *Sandstrom* cannot be considered harmless error except in "rare situations." 460 U.S. at 87. But, as we said in *Stokes, Johnson* did not involve a collateral attack on a conviction but a direct appeal, where an altogether different standard of review applies. 226 Va. at 119, 306 S.E.2d at 886.

In the present case, the basic facts are that a robbery occurred and that Jones was present at the scene actively participating. The fact to be presumed is that Jones intended to steal. In effect, Jones contends the jury probably failed to evaluate the evidence relating to his defense of intoxication in determining whether the prosecution had overcome the presumption of innocence and proved he had the requisite intent. He says the jury might have believed that after the basic facts were proved, they were bound to find the presumed fact of intent to rob without considering the intoxication question.

But the only legally relevant fact that Jones attempted to place in dispute at his trial was whether he was *involuntarily* intoxicated. Mere voluntary drunkenness was a legally insufficient defense. *See Griggs* v. *Commonwealth*, 220 Va. 46, 52, 255 S.E.2d 475, 479 (1979). As Jones' jury was instructed, *voluntary* intoxication is not a defense to either robbery, use of a sawed-off shotgun while committing robbery, or use of a firearm while committing robbery. On the subject of involuntary intoxication, the jury was told, in an instruction which arguably was unsupported by evidence, that:

"Intoxication is considered involuntary when it is produced in a person without his willing and knowing use of drugs.
"If you believe that Joseph Jones:

   (1)   Was unwillingly and unknowingly drunk by the fraudulent contrivance of others, and
   (2)   The drunkenness so unsettled Joseph Jones' ability to reason as to prevent him from exercising his own free will, then

"You cannot find him guilty."

The record is devoid of any credible evidence to suggest that Jones' intoxication, if any, was produced "unwillingly and unknowingly" as the result of "the fraudulent contrivance of others" or that any such drunkenness "unsettled" his reasoning powers so as to prevent him "from exercising his own free will." The only evidence touching those subjects was the brief testimony of Jones and his brother, who together had been convicted of five felonies, that Jones smoked a "joint" which may have been "treated with something," became ill, and lost all memory. When viewed in this

collateral attack on the conviction, such testimony regarding alleged involuntary drunkenness is legally insufficient to detract from the conclusive evidence, testimonial and circumstantial, establishing such intent.

Consequently, after viewing the alleged error in the total context of the events at the criminal trial, we hold that instruction 3 by itself did not so infect the entire trial as to render Jones' convictions violative of due process. Indeed, the instruction was wholly irrelevant and superfluous. In sum, we conclude that the criminal trial was not fundamentally unfair to Jones; he has suffered no actual prejudice.

The order appealed from, therefore, will be reversed and vacated. Because the trial court reserved its decision on Jones' other claims of ineffective assistance of counsel pending the present appeal, we will remand the case for determination of the remaining issues.

*Reversed and remanded.*