PRESENT:  All the Justices

BRIAN PATRICK RILEY

                                          OPINION BY
v.        Record No. 080920        JUSTICE CYNTHIA D. KINSER
                                          APRIL 17, 2009
COMMONWEALTH OF VIRGINIA

          FROM THE COURT OF APPEALS OF VIRGINIA


     Brian Patrick Riley was convicted in a bench trial in the

Circuit Court of the City of Alexandria of driving while

intoxicated in violation of Code § 18.2-266 and maiming another

person as a result of driving while intoxicated in violation of

Code § 18.2-51.4.  The primary issue in this appeal is whether

Riley met his burden to present evidence sufficient to establish

the affirmative defense of unconsciousness predicated upon

sleepwalking.

     Because the circuit court did not make a factual finding

that Riley was sleepwalking at the time of the charged offenses,

and because Riley's unconsciousness defense was predicated

solely on the assumption that he was in fact sleepwalking, Riley

failed to meet his burden to establish his unconsciousness

defense.  Without that defense, the evidence established merely

voluntary intoxication and was otherwise sufficient to sustain

his conviction for maiming.  We will thus affirm the judgment of

the Court of Appeals of Virginia upholding Riley's convictions.

I. RELEVANT FACTS AND PROCEEDINGS[1]

Riley drove his vehicle after admittedly ingesting three or four sleeping pills, an antihistamine, and a pain reliever. While driving, Riley struck and severely injured Paris Gebrekidan, hit two other vehicles, and then drove off the street onto grass, coming to a stop after striking a tree. As a result of the accident, which occurred at approximately 7:00 p.m. on January 27, 2006, amputation of Gebrekidan's left leg below the knee was required.

Immediately prior to the accident, Hiwot Gebrekidan, the victim's sister, had parked her vehicle beside the victim's vehicle in order to transfer shopping items from one car to the other. Hiwot turned on her hazard lights, and the two sisters exited Hiwot's vehicle to begin their task. Moments later, Hiwot heard a "big sound" and observed her sister lying on the ground. The accident took place at a dead-end street bordered by parked cars. Hiwot testified that she did not hear any sound of braking before the vehicle struck her sister, and Officer Eric Lemke, one of the police officers who responded to the accident, testified there were no skid marks on the roadway leading to the point of impact.

_____

[1] We will recite the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party before the circuit court. Gunn v. Commonwealth, 272 Va. 580, 583 n.3, 637 S.E.2d 324, 325 n.3 (2006).

Hiwot identified Riley as the driver of the vehicle that struck her sister. Hiwot testified that after the accident, she yelled for Riley, "asking where he was," but he did not respond. Instead, he followed Hiwot as she went to her apartment complex to seek assistance.

Joseph Minasie, the victim's 15-year-old nephew, observed Riley after the accident and testified that Riley was "just standing there numb as if nothing happened." When Minasie asked Riley whether he caused the accident, Riley first responded with statements that did not make any sense, but Riley finally admitted that he did, stating "it was just a chain reaction."

Several police officers spoke to and observed Riley at the scene of the accident. Officer Lemke noted that Riley was wearing sweatpants and a t-shirt despite the fact that it was 30-35 degrees outside. Officer Melvin Brooks testified that he observed Riley swaying back and forth and speaking incoherently. The officer asked Riley if he was the driver of the gray Honda involved in the accident; Riley responded incoherently, telling the officer "a friend of his had been driving his car earlier." The officer repeated the question, and Riley stated that he "was the driver of the vehicle in the accident, but [he did not]

recall what happened."  Riley also informed Officer Brooks that he had consumed "two shots of whiskey" and was a diabetic.[2]

Riley acknowledged to Officer George Ladislaw that he was involved in the accident.  Pointing to the gray Honda involved in the accident, Officer Ladislaw asked Riley if the vehicle was his.  Riley said it was not his vehicle.  When asked where his vehicle was, Riley pointed to the other side of the street and stated his car was a "346" and "[i]t is either green or green." According to the officer, there was no such vehicle on the street.

Because Riley appeared intoxicated, Officer Brooks administered field sobriety tests.  Officer Brooks explained each test to Riley, and Riley indicated that he understood the instructions and, according to Officer Brooks, "appeared to be" trying to follow the instructions.

The officer administered four tests, the "alphabet test, the number count test, [the] finger touch . . . test and the one-legged stand test."  Riley's responses to the "alphabet test" and the "number count test" were erratic.  Riley refused to perform the "finger touch test."  Officer Brooks demonstrated the "one-legged stand test" to Riley.  The officer testified

---

[2] The parties stipulated that another police officer also heard Riley state he was a diabetic.  They further stipulated that Riley is, in fact, not a diabetic.

4

that Riley, instead of standing on one foot and counting as instructed, "picked up his right foot off the ground and . . . put it right back down on the ground immediately and then . . . started walking forward." Officer Brooks then placed Riley under arrest.

Subsequently, Officer Brooks took Riley to a local hospital to have a blood test administered. The results of Riley's blood test showed he had no alcohol in his system but had .04 mg. per liter of diphenhydramine, an antihistamine; .06 mg. per liter of propoxyphene, a pain reliever; and 0.56 mg. per liter of zolpidem, a sleeping pill.

While at the hospital, Riley told two different officers that he had been drinking with friends at "Zig's Bar."[3] Riley stated to one of the officers that he thought the accident occurred off Interstate 395. When that officer tried to explain to Riley about the accident, Riley just stared at the officer. Riley told the other officer that he had been working in Front Royal that day and had returned home using Interstate 66 to Interstate 395. When the officer informed Riley that those two highways did not intersect, Riley insisted he had taken this impossible route.

---

[3] Officer Lemke found no evidence suggesting that Riley had gone to Zig's Bar on the night of the accident.

Riley's fiancée, Melanie Walck, who resided with Riley, testified that she spoke with Riley on the day of the accident at about 5:00 p.m. According to Walck, Riley told her that he was going to have dinner and then take a nap until she arrived home. When Walck arrived at approximately 10:30 p.m., she found the burners on the stove turned on, food on the kitchen counter, and plates on the table. When she checked the bedroom to see if Riley was there, she found the bed disheveled, magazines on the bed, and the bedside light on. She testified that Riley reads a paper or a magazine when he lies down to sleep. She further testified that Riley always wears sweatpants and a t-shirt when sleeping and he would never leave the house dressed in his nightclothes or without his wallet and cellular telephone.[4]

Walck could not find Riley in the apartment and became concerned that he was sleepwalking or had suffered a seizure because the circumstances were similar to those of a prior incident when Walck believed Riley had been sleepwalking. After calling some friends who lived nearby, Walck learned about the accident and went to the scene, which was approximately a quarter mile from her and Riley's apartment. Upon arriving, Walck met Officer Lemke and advised him that Riley's behavior was consistent with prior episodes when Riley had taken sleeping

---

[4] When arrested, Riley had neither his wallet nor his cellular telephone on his person.

pills.  Walck also stated Riley had abused sleeping pills in the past, causing a problem in their relationship.

Shortly after she arrived on the scene, Walck and Officer Lemke returned to her and Riley's apartment.  Walck retrieved from a briefcase several "blister packs" of medication, including "Ambien," "Lunesta," and "Sonata," as well as Riley's empty prescription bottle for Sonata.

According to Walck, Riley has a history of seizures and sleep problems.  Walck testified that during her relationship with Riley, he rarely slept seven or eight hours until he received a prescription for Sonata.  Walck further testified that Riley previously had several episodes that Walck described as sleepwalking.  She explained that four of those episodes lasted about ten to fifteen minutes each during which Riley seemed "foggy" and talked to people who were not there.  Walck testified about three longer episodes that lasted up to three hours.  In one such episode, Riley got out of bed, went downstairs, turned on the stove burners, and started cooking food.  Walck stated that Riley eventually went back to bed and returned to normal sleep.  Riley never left the apartment during any of the episodes, and he had no recollection of them when he awakened.

Riley also testified he had a history of epileptic seizures and was prescribed Sonata for sleep apnea.  The sleep apnea was

diagnosed when Riley underwent a sleep study; sleepwalking was not observed during the testing. Riley acknowledged that he had also taken Ambien intermittently over the last five to six years but claimed he did not suspect his use of sleeping pills was associated with the episodes described as sleepwalking. Riley admitted he was aware of the episodes and his bizarre behavior during them.

He further testified that on the night of the accident, he did not intend to leave the apartment and was going to bed at 5:00 p.m. for the evening.[5] Riley stated he took "probably three pills" of Ambien, but admitted on cross-examination that "based on the testing . . . it's quite obvious[]" that he took at least four pills. Riley claimed that he took more than one pill of Ambien because he wanted to be able to sleep and one pill would not have accomplished that purpose. Riley remembered taking the Ambien pills and going to bed. He stated that the next thing he remembered was being in jail.

Riley acknowledged he did not have a prescription for Ambien but had obtained samples of the medication from doctors' offices and from colleagues who are pharmaceutical representatives. Riley did, however, previously have

---

[5] Riley testified he had no recollection of his conversation with Walck two hours before the accident during which he stated he was going to take a nap.

prescriptions for Ambien. He admitted that when he was prescribed Ambien, the directions were to take one pill at a time, not to take the drug with other medications, and not to drive or operate any type of machinery. Finally, Riley acknowledged that on the evening of the accident, he took "Benadryl and a prescription pain killer" along with the Ambien and that doing so was against his doctor's instructions.

The Commonwealth called Dr. Joseph Saady, who qualified as an expert in the field of forensic toxicology and pharmacology, to testify concerning the results of Riley's blood test. Dr. Saady testified that, according to the certificate of analysis, three substances were found in Riley's blood, "diphenhydramine," an antihistamine frequently sold under the trade name of "Benadryl"; "propoxyphene," a pain reliever usually sold under the trade name of "Darvon"; and "zolpidem," a sleeping pill sold under the trade name of "Ambien."[6] According to Dr. Saady, the concentration level of the first two medications found in Riley's blood was the expected level if someone had taken a single dose of the medication. Dr. Saady, however, testified that Riley had a concentration level of Ambien that was "rather excessive." Dr. Saady opined that "a normal-size individual

---

[6] Riley was taking Darvon for back pain related to a laminectomy he underwent in 2003. The record does not indicate whether he had a prescription for this drug.

9

[would] have to take four [Ambiens] in order to achieve a .56 [mg. per liter concentration level] about an hour to an hour and a half later."

Dr. Saady explained that a patient is instructed to take Ambien just before going to bed because the medication takes effect on the individual in about 15 minutes and reaches it peak level of concentration approximately one hour after ingestion.[7] He further testified that an individual should only take Ambien if the person can get eight hours of sleep and even the next morning, the individual, in Dr. Saady's words, "should gain experience taking the drug before . . . operat[ing] machinery or do[ing] anything that requires extensive coordination and thought processes."

Continuing, Dr. Saady testified that Ambien is "pharmacologically designed to induce sleepiness" but for an individual who is awake, the medication can cause drowsiness, confusion, somnolence, and coordination problems. Somnolence, according to Dr. Saady, occurs when an individual becomes less interactive and quiet. All these side effects, in Dr. Saady's opinion, would affect a person's ability to operate a motor vehicle. Dr. Saady further opined that Riley's reported

_____

[7] According to the certificate of analysis, Riley's blood was drawn at the hospital at 8:35 p.m. on the night of the accident.

behavior on the night of the accident was consistent with an excessive dose of Ambien. He stated that the antihistamine in Riley's system "would exacerbate" the effect of the Ambien because the antihistamine may also cause drowsiness.

With regard to Riley's assertion that he was sleepwalking when the accident occurred, Dr. Saady testified it was "rare, but there are reports in the medical literature of individuals sleepwalking who have consumed" Ambien. Dr. Saady further testified that he "could find no articles on sleep driving at all." An article on sleepwalking, according to Dr. Saady, stated sleep driving could occur but was "very, very rare."

Dr. Steven Brown, who qualified as an expert in sleep, sleep disorders, and sleepwalking, testified on behalf of Riley. Dr. Brown explained that sleepwalking "is an unwelcome[,] undesirable[,] involuntary and unpredictable intrusion of arousal . . . or a degree of wakefulness into the middle of sleep." He opined that people who are sleepwalking engage in "[s]tereotypical activities" such as "cooking a meal, driving to work, [or] taking a shower." According to Dr. Brown, a person who is sleepwalking will not offer spontaneous speech but will only speak when responding to questions.

Dr. Brown further opined there are a number of triggers for sleepwalking, but they are unpredictable. He stated a person could not be induced to sleepwalk, but a person is more likely

11

to sleepwalk if suffering from sleep deprivation for a long period of time or having irregular sleep habits. He also stated "there are many medications which can trigger sleepwalking which is different than being impaired from medication."

According to Dr. Brown, the hypnotic class of medications, which includes Ambien, can trigger sleepwalking. Dr. Brown stated that an insert accompanying Ambien described sleepwalking as being a rare central nervous system side effect – rare meaning less than one in a thousand cases. Dr. Brown also testified that there is no known correlation between excessive doses of Ambien versus a single dose in terms of its likelihood to trigger sleepwalking.

In response to a hypothetical question, which was based on Riley's medical history, the events on the evening of the accident, and Riley's observed behavior after the accident, Dr. Brown opined that Riley was "sleepwalking at the time that he was driving his car." He further opined that Riley's behavior, including the inability to answer questions, the blank stares, the incoherence, and the lack of memory, were consistent with sleepwalking. Riley's prior episodes described as sleepwalking also contributed to Dr. Brown's opinion that Riley was sleepwalking on the night of the accident, rather than being merely intoxicated on Ambien.

Dr. Brown admitted on cross-examination that "sleep driving," as compared to other sleepwalking activities, is much less common. He also acknowledged that ingesting an excessive amount of Ambien would interfere with a person's ability to perform field sobriety tests because the medication affects motor coordination and impairs memory. Dr. Brown concurred with Dr. Saady's opinion that the concentration level of Ambien in Riley's blood was excessive.

During closing argument for the defense, the circuit court inquired whether Riley would be immune from criminal liability "if he were sleepwalking." The circuit court posed certain hypothetical questions, inquiring whether Riley would be criminally liable if he had set the apartment building on fire and killed twenty people or if he had killed his fiancé in a state of sleepwalking. Riley's counsel responded that Riley would have absolutely no criminal liability for those actions, and the circuit court then stated, "Okay. We understand each other." When Riley's counsel claimed that Riley had previously engaged in sleepwalking, the circuit court declared, "It happened many times and he knew it happened and he knew he engaged in bizarre behavior when it did happen." Also during closing argument for the defense, the circuit court expressed its belief that this was a case of voluntary intoxication,

13

stating, "He took an overdose of pills.  It certainly was voluntary."

After the close of the evidence and hearing the parties' arguments, the circuit court rejected Riley's unconsciousness defense and found him guilty of both charges.  The court stated:

> The fact remains in this case the Defendant did have a long history of sleep disorders.  He had a long history of what has been described as sleepwalking.  A long history of bizarre behavior during those episodes.

> It is also I believe uncontested and clear that he took a significant overdose voluntarily of Ambien coupled with two other drugs.  One of which was an antihistamine that aggravated the effects of Ambien.  There's medical expert testimony.

> I find that he either knew or should have known what the probable consequences were or if he didn't, taking voluntarily such an overdose of a drug which he certainly knew or should have known had a lot of side effects including sleepwalking if, in fact, he was, was in itself reckless disregard.

> For that reason, I'm satisfied the Commonwealth has proven its case.  [I f]ind the Defendant guilty of driving in a manner so gross, wanton and culpable as to show a reckless disregard of a human life and he did unintentionally cause serious bodily injury resulting in permanent and significant physical impairment.

> I likewise [find] him guilty of count two that he did operate a motor vehicle while under the influence of intoxicants.

At the sentencing hearing,[8] the circuit court made the following additional remarks:

> Your crime, I believe, was indiscriminately taking an overdose of non[-]prescribed drugs, essentially having no idea what might happen, not that you knew it was happening, but you set in motion an indiscriminate act that had those consequences . . . .

Riley appealed his convictions to the Court of Appeals, claiming the circuit court erred in rejecting his unconsciousness defense as to both charges and challenging the sufficiency of the evidence to sustain the maiming conviction. The Court of Appeals affirmed Riley's convictions in an unpublished opinion. Riley v. Commonwealth, Record No. 2409-06-4 (April 8, 2008). Riley argued to the Court of Appeals he had established, as a matter of law, that because he was sleepwalking, he was unconscious, and thus could not be guilty of either offense. Id., slip op. at 2. The Court of Appeals rejected his argument, holding that the circuit court never made the factual finding that Riley was sleepwalking at the time of the accident. Id. Noting that the circuit court found this

_____

[8] On the maiming conviction, the circuit court sentenced Riley to two years in the penitentiary, all but six months of which was suspended for a period of four years on condition of supervised probation for four years. The court sentenced Riley to twelve months in jail on the driving under the influence conviction. The court suspended all but six months of that sentence under the same conditions, but with the additional condition that Riley complete the Alcohol Safety Action Program. The court ordered the sentences to run concurrently.

case was one of voluntary intoxication, the Court of Appeals concluded that the affirmative defense of unconsciousness was not available to Riley. Id. The Court of Appeals also concluded the evidence was sufficient to sustain Riley's conviction for maiming another person as a result of driving while intoxicated. Id. at 5. Riley now appeals to this Court.

## II. ANALYSIS

Riley assigns error to the Court of Appeals' holding that the circuit court did not find Riley was sleepwalking at the time he committed the charged offenses. Next, Riley asserts the circuit court erred in rejecting his affirmative defense of unconsciousness as to both charges. Finally, Riley challenges the sufficiency of the evidence with regard to his conviction for maiming another person as a result of driving while intoxicated. We will first address Riley's unconsciousness defense and then consider the sufficiency of the evidence with regard to the maiming conviction.

## A. Unconsciousness Defense

This Court has defined the term "unconsciousness" as "a state of mind of persons of sound mind suffering from some voluntary or involuntary agency rendering them unaware of their acts." Greenfield v. Commonwealth, 214 Va. 710, 714, 204 S.E.2d 414, 417 (1974). "Where not self-induced, unconsciousness is a

16

complete defense to a criminal homicide."[9]  Id.  Voluntary intoxication, however, is generally not an excuse for any crime. Swisher v. Commonwealth, 256 Va. 471, 488, 506 S.E.2d 763, 772 (1998) (citing Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988)). "[T]he only exception to this general rule is in cases involving deliberate and premeditated murder." Id.

When asserting an affirmative defense, such as insanity, self-defense, or unconsciousness, the burden is on the defendant to present evidence establishing such defense to the satisfaction of the fact finder.  Shifflett v. Commonwealth, 221 Va. 760, 769, 274 S.E.2d 305, 310 (1981); see also Commonwealth v. Cary, 271 Va. 87, 99, 623 S.E.2d 906, 912 (2006) (recognizing that the burden of establishing the affirmative defense of self-defense rests on the defendant); Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (same); Lucchesi v. Commonwealth, 122 Va. 872, 883, 94 S.E. 925, 928 (1918) (stating that the defendant had the burden to prove his affirmative defense).  In this case, Riley's unconsciousness defense was predicated on his assertion that he was in fact sleepwalking when the accident occurred.  Thus, Riley had the burden to present evidence, to the satisfaction of the circuit court

---

[9] We assume, without deciding, that unconsciousness is a defense to criminal charges other than just homicide.

17

sitting as the fact finder, that he was sleepwalking at the time he committed the charged offenses.

Contrary to the Court of Appeals' conclusion, Riley asserts that the circuit court did, in fact, find that he was sleepwalking at the time of the accident in question. Pointing to the hypothetical questions posed by the circuit court and the circuit court's comments about Riley's history of sleepwalking episodes and his bizarre behavior accompanying those episodes, Riley asserts, "none of this discussion would have mattered if the court did not believe Mr. Riley had been sleepwalking." Riley also emphasizes the circuit court's statement during sentencing that "the worse case scenario did happen, not that you knew it was happening." He asserts that if the circuit court did not believe that Riley was actually sleepwalking, the court would specifically have made such a finding and held that "Riley was in knowing operation of his vehicle." We do not agree with Riley's position.

Riley's argument overlooks the significance of the circuit court's final statements before finding him guilty of the charged offenses:

> I find that he either knew or should have known what the probable consequences were or if he didn't, taking voluntarily such an overdose of a drug which he certainly knew or should have known had a lot of side effects including sleepwalking if, in fact, he was, was in itself reckless disregard.

18

(Emphasis added.).

This portion of the circuit court's ruling clearly indicates the court did not make a factual finding that Riley was sleepwalking. The circuit court's statement, "if, in fact, he was" sleepwalking, negates any argument to the contrary. At most, the circuit court made an alternative holding that if Riley was in fact sleepwalking, then his voluntary overdose of a medication he knew or should have known had side effects exhibited a reckless disregard for human life. The comments made by the circuit court concerning Riley's prior history of episodes described as sleepwalking and the bizarre behavior that accompanied those episodes support the court's alternative holding.

The hypothetical questions posed to defense counsel were exactly that, hypothetical questions; and they do not in any way establish the circuit court made a factual finding that Riley was sleepwalking. Finally, the statement by the circuit court during the sentencing hearing that Riley did not know what was happening does not alter our conclusion. A voluntarily intoxicated individual may not be aware of what is happening but would nevertheless be responsible for his conduct while in such a state. See Chittum v. Commonwealth, 211 Va. 12, 17, 174 S.E.2d 779, 782 (1970) (approving a jury instruction that stated, "A person cannot voluntarily make himself so drunk as to

19

become on that account irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does and yet be responsible."); Gills v. Commonwealth, 141 Va. 445, 450, 126 S.E. 51, 53 (1925) ("If a man voluntarily makes himself [intoxicated] he must take the consequences of his voluntary act, while [intoxicated], otherwise many crimes would go unpunished.").

We thus hold that the Court of Appeals did not err in concluding that the circuit court made no factual finding that Riley was sleepwalking at the time he committed the charged offenses. Riley, however, assumed that the circuit court did so and argued before the Court of Appeals he was entitled to an unconsciousness defense as a matter of law. Because the circuit court did not make a factual finding that Riley was sleepwalking, the factual predicate underpinning his unconsciousness defense was missing. In other words, Riley failed to meet his burden to present evidence, to the satisfaction of the circuit court, that he was in fact unconscious due to sleepwalking. See Shifflett, 221 Va. at 769, 274 S.E.2d at 310. Therefore, his defense was reduced, as the circuit court recognized, to merely voluntary intoxication.

It is well settled that voluntary intoxication furnishes no excuse for the commission of a criminal offense. Swisher, 256 Va. at 488, 506 S.E.2d at 772

20

(generally, voluntary intoxication is no defense to any crime; the only exception being deliberate and premeditated murder); Wright, 234 Va. at 629, 363 S.E.2d at 712 (same); Director, Dep't of Corrections v. Jones, 229 Va. 333, 339, 329 S.E.2d 33, 36-37 (1985) (voluntary intoxication is no defense to the crimes of robbery or use of a firearm while committing robbery); Griggs v. Commonwealth, 220 Va. 46, 52, 255 S.E.2d 475, 479 (1979) (voluntary "intoxication, whether from drugs or alcohol, is no defense to a criminal charge"); Jordan v. Commonwealth, 181 Va. 490, 494, 25 S.E.2d 249, 250 (1943) (voluntary intoxication, even when it may have "produced temporary insanity during the existence of which the criminal act was committed . . . would afford no excuse"); State v. McKeon, 38 P.3d 1236, 1238-39 (Ariz. Ct. App. 2002) ("temporary intoxication is not a defense for a criminal act or requisite state of mind if it results from the abuse of prescribed medications"); People v. Turner, 680 P.2d 1290, 1293 (Colo. Ct. App. 1983) ("where no controverting evidence is presented, a trial court would be correct in finding that excessive use of a prescription drug constituted voluntary intoxication"); Hicks v. State, 328 N.E.2d 219, 221 (Ind. Ct. App. 1975) (approving, as an accurate statement of law, a jury instruction stating that, "Temporary mental incapacity, as

21

a result of being under the influence of a narcotic or dangerous drug taken voluntarily and not on the prescription of a physician, furnishes no legal excuse for the commission of a crime" (internal quotation marks omitted)); Commonwealth, DOT, Bureau of Driver Licensing v. Lello, 571 A.2d 562, 563 (Pa. Commw. Ct. 1990) ("the person who exceeds his recommended dosage [of a prescription medication] is no different than the person who has had one drink too many . . . . In both cases there exists a situation where the prospective loss of mental and physical capacity was a foreseeable consequence when the driver undertook consumption." (internal quotation marks omitted)).

Accordingly, and contrary to Riley's argument on appeal, the circuit court did not err in rejecting his unconsciousness defense.[10]

### B.  Sufficiency Of The Evidence

Riley challenges the sufficiency of the evidence only with regard to his conviction for maiming another person as a result

---

[10] We do not decide today whether a person who ingests medication in accordance with a doctor's or a manufacturer's instructions and then experiences some type of reaction, which could not have reasonably been anticipated and which renders that person unconscious or impaired, loses the unconsciousness defense or the intoxication defense because that person voluntarily ingested the medication.

of driving while intoxicated in violation of Code § 18.2-51.4. In reviewing the sufficiency of the evidence, "[w]e consider the evidence in the light most favorable to the Commonwealth, the prevailing party in the circuit court, and we accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence." Britt v. Commonwealth, 276 Va. 569, 573, 667 S.E.2d 763, 765 (2008); accord Jay v. Commonwealth, 275 Va. 510, 524, 659 S.E.2d 311, 319 (2008); Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008).

"When a defendant challenges the sufficiency of the evidence, we accord the judgment of a circuit court sitting without a jury the same weight as a jury verdict." Britt, 276 Va. at 573-74, 667 S.E.2d at 765 (citing Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001) and Hickson v. Commonwealth, 258 Va. 383, 387, 520 S.E.2d 643, 645 (1999)). "We will affirm the circuit court's judgment unless it is plainly wrong or without evidence to support it." Id. at 574, 667 S.E.2d at 765 (citing Code § 8.01-680; Jay, 275 Va. at 524, 659 S.E.2d at 319; Bolden, 275 Va. at 148, 654 S.E.2d at 586; Tarpley, 261 Va. at 256, 542 S.E.2d at 763; and Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998)).

The statute under which Riley was convicted of maiming, Code § 18.2-51.4, provides in relevant part:

Any person who, as a result of driving while intoxicated in violation of § 18.2-266 or any local ordinance substantially similar thereto in a manner so gross, wanton and culpable as to show a reckless disregard for human life, unintentionally causes the serious bodily injury of another person resulting in permanent and significant physical impairment shall be guilty of [the maiming of another as a result of driving while intoxicated].

As the Court of Appeals held, this statute incorporates, by its terms, the culpability standard found in common law criminal negligence.  See Riley, slip op. at 4.  "Conduct that is 'gross, wanton and culpable' demonstrating a 'reckless disregard for human life' is synonymous with 'criminal negligence.' "  Jones v. Commonwealth, 272 Va. 692, 701, 636 S.E.2d 403, 408 (2006) (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).  "Criminal negligence is judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts."  Id.  (internal quotation marks omitted).

This Court has defined criminal negligence in terms of gross negligence, stating:

" 'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton or wilful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts."

24

Cable, 243 Va. at 240, 415 S.E.2d at 220 (quoting Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938)).

The level of intoxication is "relevant to a determination of the degree of the defendant's negligence: whether ordinary, gross, or wanton." Essex v. Commonwealth, 228 Va. 273, 283, 322 S.E.2d 216, 221-22 (1984). "It may serve to elevate the defendant's conduct to the level of 'negligence so gross, wanton, and culpable as to show a reckless disregard of human life.' " Id. at 283, 322 S.E.2d at 222 (quoting King v. Commonwealth, 217 Va. 601, 607, 231 S.E.2d 312, 316 (1977)).

We hold that the evidence was sufficient to convict Riley of maiming another person as a result of driving while intoxicated. Riley voluntarily ingested an overdose of Ambien in conjunction with other medications, one of which enhanced the effect of the Ambien. He did not have a prescription for the Ambien. His blood test revealed an excessive amount of Ambien in his system indicating that he had ingested at least four times the regularly prescribed dose. See Stevens v. Commonwealth, 272 Va. 481, 488, 634 S.E.2d 305, 310 (2006) (holding that defendant's high level of intoxication alone justified a finding that his conduct was gross, wanton, and culpable). Riley admitted knowing that he was supposed to take only one pill of Ambien at a time and avoid driving or operating any type of machinery. He also admitted that by taking the

Ambien along with an antihistamine and a pain reliever, he was violating his doctor's instructions. Riley, in this intoxicated state, nevertheless drove his vehicle and struck the victim and two other vehicles before hitting a tree, all without any apparent braking. The victim suffered serious injuries requiring the amputation of her left leg.

After the accident, Riley failed several field sobriety tests. Witnesses who observed Riley at the scene of the accident and at the hospital testified about his unusual behavior. Riley could not accurately recall the events that had transpired subsequent to, and even prior to, ingesting the Ambien. He did not seem to know what had happened or that he had caused the accident, and he gave bizarre responses to questions asked of him. Dr. Saady testified that Riley's behavior after the accident was consistent with an individual who had taken an overdose of Ambien. Further, Walck informed police at the scene of the accident that Riley's behavior that evening was similar to his behavior on other occasions when he had ingested sleeping pills.

We hold that the circuit court's judgment was not plainly wrong or without evidence to support it. See Code § 8.01-680; Britt, 276 Va. at 574, 667 S.E.2d at 765. Riley's conduct on the evening in question was wilful in nature, "showing a reckless or indifferent disregard of the rights of others," and

was committed under "circumstances reasonably calculated to produce injury," or which made it "not improbable that injury [would] be occasioned," and Riley knew, "or is charged with the knowledge of, the probable result of his acts."  Cable, 243 Va. at 240, 415 S.E.2d at 220.  See also Stevens, 272 Va. at 488, 634 S.E.2d at 310 (while the defendant's high level of intoxication alone justified a finding that his conduct was gross, wanton, and culpable, the fact that the defendant ran a red light, failed to apply his brakes before the collision, and did not know what he had struck were additional circumstances supporting the finding).

## III.  CONCLUSION

For these reasons, we will affirm the judgment of the Court of Appeals upholding Riley's convictions for driving while intoxicated and maiming another person as a result of driving while intoxicated.

Affirmed.