Richmond

## JACKSON DAVID SHIFFLETT, SR.

### v.

## COMMONWEALTH OF VIRGINIA

January 16, 1981.

Record No. 800535.

Present: All the Justices.

*Eaton Brooks (Taylor, Brooks, Zunka & Murray,* on brief), for appellant.

*Vera S. Warthen, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

A jury found Jackson David Shifflett, Sr., guilty of the willful, deliberate and premeditated murders of Michael Shaffer and Denvil Mason, the felonious use of a shotgun while committing each murder, and the malicious wounding of Dennis Sears. The jury fixed his punishment at confinement in the State penitentiary for life for each of the murders, one year for each of the felonious uses of a shotgun, and 20 years for the malicious wounding. On December 14, 1979, the trial court entered judgment on the verdicts.

The offenses of which Shifflett was convicted were committed on February 2, 1979. After examination by Dr. Robert S. Brown, a psychiatrist of his choice who reported that Shifflett was competent to stand trial but was insane at the time the alleged offenses were committed, the accused filed his Notice of Insanity Defense on June 22, 1979.[1] Three days later the Commonwealth filed a motion for a psychiatric examination to determine whether Shifflett was competent to stand trial or assist in his defense, as provided by Code § 19.2-169, and also to determine "whether he was insane at the time the alleged offenses were committed". Shifflett objected to the motion insofar as it sought to determine his mental condition at the time of the alleged offenses. Nevertheless, after conducting a hearing on the question, the trial court overruled the objection and ordered the two-part examination to be made at Southwestern State Hospital. Upon completion of the examination, Dr. Frank F. Merker, Medical Director of the Forensic Psychiatric Unit of that institution, reported the opinion of the Staff that Shifflett had an antisocial personality but was mentally competent to stand trial and assist in his defense, and that he was not insane. The report further stated that no evidence had been found of any "mental condition or disorder which would have interfered with his ability to appreciate the nature, extent, consequences and wrongfulness" of his alleged offenses, or of a "mental state which would have substantially interfered with his ability to conform his conduct to the requirements of the law".

Several months before trial, Shifflett filed a motion for a change of venue or a change of venire on the ground that because of prejudicial publicity he could not receive a fair trial in Rockbridge County or from a jury impanelled in that county. Attached to his motion were copies of newspaper articles concerning the shootings and subsequent legal proceedings, as well as affidavits from more than fifty local citizens asserting that Shifflett could not receive a fair trial in Rockbridge

---

[1] Code § 19.2-168 requires that an accused who plans to present psychiatric evidence of his insanity at trial give written notice thereof to the Commonwealth's Attorney at least ten days prior to trial.

County. It was agreed by the trial court and opposing counsel that a ruling on the motion should be deferred until an attempt had been made to impanel a local jury.

During extensive *voir dire* examination of prospective jurors on December 12, 1979, Shifflett moved to exclude Edna Miller, Margaret Donald, and Frances Reynolds for cause. The motion was denied, and a panel of twenty was selected, of which twelve jurors and an alternate were sworn. The trial court then overruled Shifflett's motion for a change of venue or a change of venire, ruling that the affidavits contained merely conclusory statements, that there had been no undue publicity—the news articles having clearly labelled what were facts and what were allegations—and that a local jury had in fact been impanelled.

At trial, as Shifflett's counsel conceded in his opening statement that Shifflett committed the acts in question, the only issue for the jury to decide was whether Shifflett was sane or insane when the alleged offenses were committed. The Commonwealth's evidence showed that on the evening of February 2, 1979, Shifflett sought to find his nineteen-year-old unmarried daughter, Patricia, who was living in the home of Mike and Debbie Shaffer. About 10:00 p.m., Patricia, her friend Dennis Sears (who was Debbie Shaffer's brother), Denvil Mason, and the Shaffers returned home in Mike Shaffer's car. As Shaffer got out of his car, Shifflett drove into the driveway, jumped out and shot him in the back with a 12-gauge shotgun. Shifflett then shot Mason in the back and neck and Sears in the face. Shifflett's daughter was struck in the left hand by stray pellets. When her father stopped to reload his gun, she seized a pistol in the Shaffer car and fired several times at him, one bullet wounding Shifflett in the shoulder. He fled but was soon apprehended and removed to a hospital. Shaffer and Mason died from their wounds; Sears recovered, after extensive medical treatment.

Dr. Brown, the chief witness for the defense, testified that Shifflett suffered from a paranoid personality disorder and from a psychotic depressive reaction. In his opinion, on the date of the shootings Shifflett did not understand right from wrong, did not understand the nature, character and consequences of his acts committed on that date, and was legally insane. The witness believed that Shifflett was still dangerous and psychotic and should not be released into society.

The Commonwealth presented various rebuttal witnesses, including two nurses and two doctors who had treated Shifflett at the hospital after the shootings and who testified that he acted like any other patient suffering from similar injuries, and that his appearance, con-

versations, and actions in their presence were normal. The chief rebuttal witnesses were two staff members from the Forensic Psychiatric Unit of Southwestern State Hospital who had examined Shifflett pursuant to the order of the trial court.

Robert R. Baron, a clinical psychologist, described the tests and interviews conducted to evaluate Shifflett's mental condition. In Baron's opinion, Shifflett was not psychotic or insane on February 2, knew what he was doing at that time, and knew that it was wrong. Shifflett had an antisocial personality but was not legally insane. Dr. Merker, the Medical Director, testified that he and his staff were of opinion that Shifflett was competent to stand trial and assist in his defense, and that he was legally sane when he shot the victims on February 2. There was no doubt in Dr. Merker's mind that Shifflett knew what he was doing when he fired the shots, and that he was able to understand right from wrong.

Shifflett contends that the trial court erred in requiring him, over his objection, to submit to the examination at Southwestern State Hospital to determine whether he was insane at the time of the alleged offenses. He correctly points out that there is no statutory authority to compel such an examination. Code § 19.2-169 authorizes an examination by a "psychiatric committee of one or more physicians skilled in the diagnosis of insanity", prior to arraignment, to determine whether a person charged with crime is "mentally competent to plead and stand trial or assist in his own defense." Code § 19.2-170 authorizes an examination for the same purpose after arraignment. Neither provision, though preceded by § 19.2-168 requiring notice of an insanity defense, contains any language expressly limiting the committee's inquiry to competency to stand trial, or forbidding it to go into the question of insanity at the time of the alleged offense.

Shifflett says that Code § 19.2-173[2] shows an unmistakable legislative intent to prohibit the Commonwealth from conducting an examination to determine his mental condition prior to the time of the examination. This statute, however, is limited in its application to Code § 19.2-172,[3] which requires the trial court to appoint a commis-

---

[2] Code § 19.2-173 provides in pertinent part:
"*If the commission find the accused to be sane at the time of their examination, they shall make no other inquiry.* . . . If the commission find that he is insane . . . at the time of their examination the court . . . shall order him to be confined in the proper hospital until he has been restored to sanity." (Emphasis added).

[3] Code § 19.2-172 provides:
"If any person so committed for observation pursuant to § 19.2-169 or § 19.2-170 is, in the opinion of the superintendent, insane or feebleminded,

sion to render a second opinion after the superintendent of the facility to which the accused was committed for observation has reported his opinion that the person is insane.[4]

A brief review of the legislative history of the statutes prescribing the procedures to be followed when the sanity of a person charged with a crime is questioned will more clearly reveal why the restrictive inquiry now provided by § 19.2-173 applies only to the commission appointed pursuant to § 19.2-172.

The 1849 Code, which incorporated into chapter 208 as § 16 (now § 19.2-167) the established common law principle that "[n]o person shall, while he is insane, be tried for a criminal offence", made provision for determining the question of sanity. Section 17 of chapter 208 provided that where the trial court, at the time of trial, had "reasonable ground to doubt" the accused's sanity, it was to suspend the trial until a jury, impanelled at the bar of the court, inquired into the matter. The statute further provided:

> "If the jury find the accused to be sane at the time of their verdict, they shall make no other enquiry, and the trial in chief shall proceed. If they find that he is insane, they shall enquire whether or no he was so, at the time of the alleged offence. If they find that he was so at that time, the court may dismiss the prosecution. . . . If they find that he was not so, at that time, the court shall commit him to jail, or order him to be confined . . . until he is so restored that he can be put upon his trial."

This provision was incorporated into the 1887 Code as Section 4031. The 1887 Code also included, as Section 4032, the provisions of Section 18 of chapter 208 of the 1849 Code, permitting a trial court having reason to doubt the sanity of an accused, after conviction but prior to sentencing, to impanel a jury to determine the question.

Section 4909 of the 1919 Code supplemented the procedure for determination by a jury of sanity at the time of trial with a provision

the superintendent shall report such finding to the court from which such person was committed but shall retain custody of such person subject to the further order of the court. And upon receiving such report the court, after notice to the attorney for the Commonwealth and counsel for the accused, shall appoint a commission of not to exceed three physicians, skilled in the diagnosis of insanity and feeblemindedness, any or all of whom may be from the staff of the facility where the person is committed for observation, who shall inquire into the fact as to the sanity or mentality of such person and report their findings to the court."

[4] When originally enacted, as § 19.1-230.1, the statute merely permitted the trial court to appoint the commission, Acts 1964, c. 231, but it was soon amended to make such appointment mandatory. Acts 1966, c. 715.

allowing the court, prior to trial, to commit the accused for a determination of his mental condition. Section 19-202 of the 1950 Code modified this pretrial procedure by allowing the court to commit the accused, as in Section 4909, or to appoint a commission of "one or more physicians skilled in the diagnosis of insanity, or other qualified physicians" to examine him before a commitment was ordered. Section 19-203 added that if at trial the court doubted the defendant's sanity, it could suspend the trial and either follow one of the two procedures authorized by Section 19-202 or impanel a jury to make the determination. Section 19-205 provided, in the language of Section 4031 of the 1887 Code, that if either the jury or the commission found the defendant sane at the time of trial, there was to be no further inquiry. It also stated, as Section 4031 had, that if the *jury* found the accused insane at the time of trial, it was then to inquire into his sanity at the time of the alleged offense. Again, this contemplated dismissing the prosecution if the jury found him insane at the time of the offense, and holding him for trial if he was sane.

Section 19-205 did not specify what was to follow a finding by the *commission* that the defendant was insane at the time of trial. Presumably in that case the defendant would merely be held until he was able to stand trial, the point being that only the jury, and not the commission, had the power to find a defendant insane at the time of the offense and thus absolve him of guilt. The only question to which the commission could speak authoritatively was whether he was insane at the time of trial. The defendant's sanity at the time of the offense is included in the larger question of guilt, which is a jury issue. *See Stover's Case,* 92 Va. 780, 787, 22 S.E. 874, 876 (1895). Accordingly, there was no justification for permitting a commission to inquire into this matter if the defendant could not then be tried.[5]

In 1964, the option provided in § 19-203 of the 1950 Code of impanelling a jury to inquire into sanity at the time of trial was eliminated. Acts 1964, c. 231. Under § 19.1-229 (now § 19.2-170), at this preliminary juncture, the court could only commit the defendant or appoint a commission.

---

[5] This basic procedural framework remained through the 1960 amendments to the Code: further inquiry was prohibited if the jury or commission found the accused to be sane at the time of trial, the *jury* was required to inquire into sanity at the time of the alleged offense if they determined the accused to be insane at the time of trial, and there was still no provision for a procedure to be followed upon a finding by the *commission* that the accused was insane. Section 19.1-231, Acts 1960, c. 366. *Thomas* v. *Cunningham,* 313 F.2d 934 (4th Cir. 1963) failed to note the distinction between the functions of the jury and the commission and misconstrued § 19.1-231 in this respect. *Id.* at 939, n. 12.

Also in 1964, a provision was added which delineated procedures to be followed should the superintendent of the institution to which the accused had been removed find him to be insane.[6] Under § 19.1-230.1, upon such a finding by the superintendent, the court was authorized to appoint a commission to review this determination.[7] Section 19.1-231 (now § 19.2-173), immediately following § 19.1-230.1 (now § 19.2-172), continued the prohibition against any further inquiry if the "commission" found the accused to be sane.[8] As a consequence of the 1964 amendments, there were two commissions potentially involved in the determination of an accused's sanity, one appointed at or prior to trial, and the other appointed to review a finding of insanity made by the superintendent. In 1973, however, the General Assembly eliminated this confusion by deleting the word "commission" in § 19.1-228 (now § 19.2-169) and substituting in lieu thereof a "psychiatric committee" of one or more physicians. Acts 1973, c. 466. Thus, the commission whose inquiry is limited by § 19.1-231 (now § 19.2-173) could only be the commission established by § 19.1-230.1 (now § 19.2-172), as this is the only commission now authorized to make a pretrial examination. We construe the statutory scheme, therefore, to mean that there is no express or implied restriction on the inquiry to be made by the psychiatric committee acting pursuant to § 19.2-169.

The question remains whether the trial court, without express statutory authorization, has the power to order an inquiry as to the accused's sanity at the time of an alleged offense. Many jurisdictions have provided by statute or rule for such an examination of an accused. *See Bremer* v. *State,* 18 Md. App. 291, 316-18, 307 A.2d 503, 519-20 (Ct. Spec. App. 1973), *cert. denied,* 415 U.S. 930 (1974); *People* v. *Larsen,* 74 Ill.2d 348, 351-52, 385 N.E.2d 679, 681 (1979); *State* v. *Johnson,* 383 A.2d 1012, 1020-21 (R.I. 1978); Annot., 32 A.L.R.2d 434 (1953). Other courts have ruled that a trial court has inherent authority to order such an examination, without express authorization. *See State* v. *Seehan,* 258 N.W.2d 374, 377-78 (Iowa 1977). In *United States* v. *Albright,* 388 F.2d 719 (4th Cir. 1968), where an examination was authorized under a federal statute to determine competency for trial, it was held that examination

---

[6] In the earlier Code, § 19-204 had provided for return of the accused for trial if the superintendent found him not insane, but it did not make provision for further proceedings upon a finding of insanity.

[7] See footnote 4, *supra.*

[8] If the commission found the accused to be insane, there still was no further inquiry provided for and he was just to be held until competent to stand trial.

also as to sanity at the time of the alleged crime was proper. Of course under federal criminal procedure and the procedure of many of the states the burden of proof as to the defendant's sanity is on the prosecution.

In Virginia, unlike many jurisdictions, insanity is an affirmative defense that the defendant must establish to the satisfaction of the fact finder. *Jones* v. *Commonwealth,* 202 Va. 236, 240, 117 S.E.2d 67, 70 (1960).[9] Shifflett argues that since he has the burden of establishing his insanity at the time of the alleged offenses, the Commonwealth should not be permitted to examine him for the purpose of rebutting his evidence on the issue. We do not agree. The Commonwealth has the duty to all its citizens to see that justice is fairly administered so that those legally responsible shall answer for their crimes, and that those not legally responsible for their antisocial acts shall not be punished. Although sanity or insanity may be established by lay witnesses, it is generally recognized that it is advisable to adduce expert testimony to better resolve such a complex problem. *See Alexander* v. *United States,* 380 F.2d 33, 39 (8th Cir. 1967). And, the longer the time that elapses between the offense and the examination, the more difficult may be the task of making an accurate evaluation. Accordingly, we hold that the trial court had the inherent power to require Shifflett to be examined by a psychiatric committee in order that his examiners might report their opinion as to his sanity at the time of his alleged crimes and testify to such opinion if called by the Commonwealth as rebuttal witnesses.

▮ Shifflett has expressed concern that such a rule as we have just enunciated would violate an accused's constitutional rights, including Fifth Amendment, Sixth Amendment, and general due process protections. These issues were not raised below and thus need not be addressed by us for proper disposition of this case. We will, however, point out that here, before the court ordered any psychiatric examination for the Commonwealth, the defendant was first examined by a psychiatrist of his own choosing and had filed his notice of an insanity defense. Shifflett made no request for the assistance of counsel during the court-ordered examination, and no incriminating statement made by him during this examination was introduced into evidence to prove the acts committed by him. *See State* v. *Steelman,* 120 Ariz. 301, 317, 585 P.2d 1213, 1229 (1978). *Cf. Gibson* v. *Zahradnick,* 581 F.2d 75, 78-79 (4th Cir.), *cert. denied,* 439 U.S. 996 (1978), and cases cited therein. The state's expert testimony adduced in connection

---

[9] While this rule has been subject to criticism, *Timmons* v. *Peyton,* 360 F.2d 327, 332 (4th Cir. 1966), it is not in issue here.

with the examination was introduced not as a part of the Commonwealth's case-in-chief, but only as rebuttal evidence, in response to the defendant's case, which consisted of the defense of insanity. We see no reason, given these facts, to restrict the court's inherent authority to order the examination and we hold, therefore, that the court's action was proper.

Shifflett contends that the trial court erred in overruling his motion to exclude from the jury panel for cause Frances B. Reynolds, Margaret G. Donald, and Edna M. Miller. These three persons were examined on *voir dire* with two others, one of whom was excluded for cause and one seated without objection. All had read about the shootings shortly after they occurred in February. In response to questions propounded by the court, they gave assurances that they could differentiate between what they had read and what they would hear as evidence, and could eliminate anything learned outside the courtroom and decide the case on the evidence.

In answer to questions asked by Shifflett's counsel, Reynolds, Donald, and Miller acknowledged having some opinion based on what they had read about the shootings months before. When defense counsel asked if he would have to put on any evidence to overcome the opinion, Miller said that she thought she "would have to hear something else". Donald said that she could set aside any opinion but finally conceded, when asked by defense counsel if he would have to put on evidence to change her opinion, "I guess I will have to say that," and "I think you would have to. I want to hear both sides". Reynolds said that she had formed an opinion in February, thought she would have an open mind, but wanted "to hear both sides".

At the time these questions were propounded the prospective jurors had received no instruction from the court as to the burden of proof or the defendant's presumption of innocence. As the court later observed, in ruling on the motion to exclude, the jurors were being asked opinions when they did not know the law.

Defense counsel propounded additional questions to them relating to the insanity defense. None had read anything about such a defense, or that Shifflett was going to rely upon it. The court asked if the insanity defense would affect their ability to decide the case, and each responded that it would not. The court asked if they could follow the instruction as to the insanity defense "as well as any other", and they replied affirmatively. Defense counsel then concluded his *voir dire* of these prospective jurors by asking if they had formed any opinion as to Shifflett's sanity, and all replied, "No".[10]

[10] All potential jurors who expressed an opinion as to Shifflett's sanity or an

In overruling the motion to exclude the three jurors, the trial court stated that in considering all answers of the three, their manner and demeanor, the context in which the answers were given, their lack of hesitancy, and their tone of voice, it was clear that they had no opinion that could not "easily be set aside, no bias or prejudice", and that they could decide the case solely on the law and the evidence. As we have said before, we are not concerned with what potential jurors have read, or whether they know the law; what matters is their state of mind—whether they have formed a fixed and decided opinion. *Justus v. Commonwealth,* 220 Va. 971, 976-78, 266 S.E.2d 87, 91 (1980); *Breeden v. Commonwealth,* 217 Va. 297, 298-300, 227 S.E.2d 734, 736 (1976); *Slade v. Commonwealth,* 155 Va. 1099, 1106, 156 S.E. 388, 391 (1931).

However, it is unnecessary for us to reach the question whether their responses to questioning evinced such a state of mind as to disqualify the three prospective jurors. Any tentative opinions formed by them in February were that the shootings had been perpetrated by Shifflett. But this fact was not in controversy. As Shifflett's counsel subsequently informed other prospective jurors on *voir dire* examination and reiterated in his opening statement, the sole issue was whether Shifflett was sane or insane when he committed the acts. Therefore, any previously held opinion that Shifflett fired the gun was irrelevant to a determination of his criminal responsibility for his acts. None of the three prospective jurors had formed any opinion as to Shifflett's sanity, and, indeed, none was aware that he was relying upon an insanity defense. The context in which their responses to questions were given distinguishes this case from *Martin v. Commonwealth,* 221 Va. 436, 271 S.E.2d 123 (1980), *Justus,* and *Breeden,* where similar answers relating to issues in controversy disqualified prospective jurors.[11] We hold that the trial court did not err in overruling the motion to exclude Reynolds, Donald and Miller.

■ There is no merit in Shifflett's contention that the trial court erred in overruling his motion for a change of venue or a change of venire. We have recently reaffirmed, in *Coppola v. Commonwealth,* 220 Va. 243, 247-48, 257 S.E.2d 797, 801 (1979), the principles

aversion to the insanity defense, or who said that they probably could not follow an instruction as to insanity if they believed, whether based on pretrial information or evidence at trial, that Shifflett committed the acts in question, were excluded from the panel.

[11] Whether a juror is impartial and stands indifferent to the cause is to be determined in light of the controverted issues. *See State v. Jackson,* 43 N.J. 148, 157-58, 203 A.2d 1, 6 (1964); 47 Am. Jur.2d, *Jury* § 297 (1969), note 18 and accompanying text.

controlling adjudication of the issues arising from such a motion upon appellate review. The motion is addressed to the sound discretion of the trial judge, whose action in overruling it will not be reversed unless the record affirmatively shows an abuse of discretion. The burden is upon the defendant to rebut the presumption that he can receive a fair and impartial trial by a local jury in the county where the alleged offenses were committed.

The record in this case fails to show an abuse of discretion by the trial judge in overruling Shifflett's motion. Without objection, ruling on the motion was deferred pending an attempt to impanel a jury in Rockbridge County. After a jury had been impanelled in that county, the motion was overruled.

There is no evidence that pretrial publicity that began in February, 1979, was inaccurate, excessive or otherwise prejudicial to Shifflett. Numerous articles appeared in newspapers circulated in the county, but they were not couched in lurid, hysterical, or inflammatory language. Factual reports were published as to the shootings, the legal proceedings, the results of Shifflett's examinations by private and state psychiatrists, and the possibility that he would plead the defense of insanity. Several prospective jurors who on *voir dire* expressed disbelief in the validity of such a defense and unwillingness to accept it were excluded for cause. Others were unaware that Shifflett planned to rely on the defense of insanity. Although the prospective jurors had read or heard something about the shootings by Shifflett, not one accepted for jury service had formed any opinion as to his sanity, the crucial question in the case.

The affidavits of citizens in the county filed in support of Shifflett's motion were in identical form and language. They were merely conclusory statements that he could not receive a fair and impartial trial in that county because of widespread belief that he was guilty of the alleged offenses. No reference was made in the affidavits to any prejudice prevailing in the event Shifflett pleaded an insanity defense.

A disinterested and impartial jury was selected in less than a day, after comprehensive *voir dire* examination. Only eight prospective jurors were excluded because of prejudice or fixed pretrial opinions or aversion to the defense of insanity. We hold that the record fails to show that the trial court erred in overruling Shifflett's motion for a change of venue or a change of venire.

For the foregoing reasons, the judgment of the trial court will be affirmed.

*Affirmed.*