UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Malveaux and Fulton
Argued at Fredericksburg, Virginia


VINCENT ANTHONY CABRERA WESLEY

MEMORANDUM OPINION* BY
v.        Record No. 1694-22-4                JUDGE JUNIUS P. FULTON, III
                                              AUGUST 22, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert J. Smith, Judge

Zachary J. Stafford (Lawrence Smith & Gardner, on brief), for
appellant.

Jason A. Faw, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, the trial court convicted Vincent Anthony Cabrera Wesley of

strangulation and aggravated malicious wounding and imposed an active sentence of five years for

each conviction, to be served concurrently.  Wesley argues that the evidence was insufficient to

establish aggravated malicious wounding because the Commonwealth did not prove that the

victim's injury was "permanent and significant" as required by Code § 18.2-51.2.  Wesley also

contends that because he "established by a preponderance of the evidence that he was insane at the

time of the offense," the trial court erred in denying his motions to strike the two charges.  We find

no trial court error and affirm the judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any of Wesley's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

A grand jury indicted Wesley for aggravated malicious wounding, strangulation, and abduction. Wesley filed written notice under Code § 19.2-168 that he intended to challenge his sanity at the time of the charged crimes and to present expert testimony to support his claim of insanity. Wesley also provided notice under Code § 19.2-271.6 that he intended to present evidence concerning "his mental condition at the time of the alleged offense, including expert testimony" tending to show that he "did not have the intent required for the offense charged and is otherwise admissible pursuant to the general rules of evidence."

The evidence proved that on May 13, 2020, Meredith Carrington was visiting a friend who lived in Fairfax County. Although she resided in Ohio, Carrington was familiar with the area because she had lived there until 2016. That morning, Carrington left the house by herself for a walk. That same morning, Wesley texted the supervisor at his job as a maintenance worker with Fairfax County Park Authority and obtained approval to take the day off.

On her walk, Carrington proceeded down a bike path through a wooded area near a group of townhomes. As she was turning right at the end of the path, Carrington saw Wesley behind her walking toward her down a hill. Wesley wore a mask over his face and appeared to be looking down at his phone. Carrington continued walking for about ten more minutes, then turned onto a fitness trail that made a loop.

After Carrington exited the fitness loop to return to the main trail, Wesley appeared at the entrance of the loop. She noticed him take a "quick left" toward her. Wesley reached down with his right hand. As she crossed paths with Wesley, he struck her on the head with a hard object. Carrington screamed for help, but Wesley continuously struck her in the head and face. She tried to fight him off, to no avail. Carrington resisted when he tried to take her to the ground, and she used her hands behind her so that he could not "push [her] all the way down." Wesley put both of his hands around Carrington's neck and yelled, "Shut up, shut up." While Wesley squeezed her neck, Carrington tried to scream for help but "no words were coming out." At that point, she could "feel [her] vision tunneling." Carrington kicked Wesley as hard as she could, and he took a few steps backward. She begged him to stop the beating; she believed that she was pleading for her life. Wesley then appeared a "little shaken" and said that he was sorry.

John Shorter lived in a townhouse near the woods where Wesley attacked Carrington. On the morning of May 13, 2020, he ran from his home into the woods after he and his wife heard a woman screaming for help. Shorter also heard a male voice yelling.

Following the sound of the screams, Shorter spotted Wesley standing over Carrington and attacking her. Wesley appeared to have an object in his hand. Shorter yelled at Wesley to stop and to "leave her alone." Wesley raised his head, looked in Shorter's direction, and then fled into the woods.

Shorter helped Carrington get up and walk out of the woods to Shorter's home, and his wife called the police. Carrington was "covered in blood." When the police arrived, they noticed a large gash on Carrington's head. An ambulance transported Carrington to the hospital.

At around noon that day, after receiving information about the attack on Carrington and while searching the area for the perpetrator, Lieutenant Michael Johnson saw Wesley from the end of a wooded walking trail. Wesley was about 20 to 30 yards from Lieutenant Johnson; Wesley

carried a cell phone and was breathing heavily. When the officer asked what he was doing, Wesley said he was out jogging. Lieutenant Johnson noticed what appeared to be blood on Wesley's pants. The officer handcuffed Wesley and detained him. Wesley appeared nervous, but he asked no questions about the detention.

As soon as Lieutenant Johnson placed Wesley beside the police cruiser, Wesley started yelling that he had "screwed up" or "messed up" or "fucked up." Wesley said he needed to defecate, but the officer replied that Wesley needed to wait. Wesley started yelling, defecated in his pants, and thrashed about. He also told the officer to "[j]ust shoot" or "just hurt" him. Eventually, the police restrained Wesley on the ground and had to prevent him from banging his head on the road. Wesley was removed from the scene by ambulance.

At the hospital, Wesley banged his head against the hospital bed. When an officer tried to photograph him, Wesley "stuck his finger in his butt" and "flicked poo" at the officer across the room. When another officer arrived to obtain blood and buccal samples from Wesley, he commented, "I did a bad thing."

A police canine tracked a scent from the location where Wesley attacked Carrington through the woods to the place where Lieutenant Johnson detained him. The distance from the starting point to the end of the track was about one-half of a mile. It took the tracker about 15 minutes to cover the distance. The police found a red-stained stick near the area of the attack. The police also found in the woods a green sweatshirt and white work gloves; the items were stained with blood. Both Carrington's and Wesley's DNA were found on the shirt.

During the attack, Wesley hit Carrington at least five times in the head, and she suffered more blows to the face and "[v]arious other places too." She sustained a concussion. She had a laceration on the top of her head, injuries to her mouth, and her head was swollen to about twice its normal size. The injuries on her neck were consistent with strangulation. Carrington's medical

treatment for her head wounds included twenty-eight staples in her head and stitches in her mouth and forehead. Carrington suffered black eyes and a "significantly bruised" nose. She also had scrapes and bruises on her legs and elbows. Carrington suffered nerve damage in her right hand that took six to eight months to resolve. At trial, Carrington exhibited the scar she sustained to her forehead and indicated her other scars in her hairline that remained sensitive to the touch.

The Commonwealth introduced recordings of calls Wesley made from jail on May 13, 14, and 20, 2020. In one call, Wesley stated that he had "snapped" and that he "lost it." He said he thought the victim "was a guy," but he was wrong about that. He expressed reluctance to discuss the incident in detail because he knew the phone calls were recorded and asked his girlfriend to retrieve his car. In a call on May 14, Wesley lamented that he had been "stupid" because he "ran back in" the perimeter the police were searching and could have avoided detection by laying down and hiding in place. Later, Wesley provided his girlfriend more specific information about the location where he had left his car, near a clubhouse and some tennis courts.

Testifying on Wesley's behalf, his mother Roselynn Wesley (Roselynn) described his childhood medical history and learning disabilities. Wesley had family members who suffered with bipolar disorder, schizophrenia, and autism. Roselynn said that a therapist diagnosed Wesley with depression, but claimed that he had never demonstrated aggressive tendencies.

During an episode in 2019 when Wesley threatened to hang himself with a belt, Roselynn tried to restrain him, and he responded by biting her. Wesley's then girlfriend urged Roselynn to call 911, and Wesley told her to go ahead because he was going to "die by cop." Following the incident, Wesley was voluntarily committed for ten days. Wesley was prescribed medication after his release, but he stopped taking it because it interfered with his ability to help care for his infant daughter.

On a subsequent occasion, as Roselynn was taking Wesley's girlfriend and her baby to her parents' home after an argument, Wesley ran in front of Roselynn's car and she hit him. On May 7, 2020, just days before the attack, Roselynn said that she found Wesley "banging" his head against the steering wheel of his car after an argument with his girlfriend.

After the attack on Carrington, Roselynn and Wesley's girlfriend found his car parked at an Alexandria clubhouse, as he had described. The car was unlocked, and the keys were in the ignition.

The defense retained Dr. Sara Boyd to evaluate Wesley's sanity at the time of the offenses. Dr. Boyd qualified as an expert in the field of psychology and the evaluation of sanity at the time of the charged crimes. Dr. Boyd met with Wesley three times by video to evaluate him, and she reviewed records from law enforcement and his prior psychiatric hospitalization. She conducted collateral interviews with Roselynn and Wesley's former girlfriend. Dr. Boyd noted that Wesley had an unusually high number of first-degree family members with autism spectrum disorders, as well as family members with serious mental illness.

Dr. Boyd identified several stressors that Wesley was facing at the time of the offenses: the onset of the COVID-19 pandemic, living in the same house with his immediate family in addition to his girlfriend and infant, and the birth of his daughter. Dr. Boyd opined that Wesley suffered from a mental disease involving psychosis and severe mood symptoms. Dr. Boyd further opined that psychosis impairs a person's ability to perceive reality accurately. While she was unable to diagnose Wesley more specifically without an extended period of time to treat him, Dr. Boyd speculated that his mental illness was either schizophrenia spectrum disorder or mood disorder with psychotic features. She stated that Wesley's conduct before May 2020 had involved intermittent psychotic episodes.

Dr. Boyd opined that Wesley had an acute episode of psychosis and mood symptoms at the time of the offenses and that the episode then dissipated; Dr. Boyd believed that by kicking Wesley, Carrington "seemed to reorient him to reality." She stated that Wesley apologizing to Carrington suggested an appreciation of what had happened in that moment. Dr. Boyd indicated that the ability to control behavior during a psychotic episode differed among people affected by similar mental conditions. When asked whether Wesley had volitional control at the time of the assault, Dr. Boyd stated: "In my view, the issue was the disorganization. It's not so much about a person choosing or not choosing. It's that there's no opportunity to make a choice in this kind of state." She explained that under such circumstances there was a direct path from having the impulse in the mind to acting upon it, with no "gatekeeping." She believed that Wesley was too "disorganized" to have the ability to make the choice to attack Carrington.

In closing argument concerning Wesley's mental state at the time of the offenses, defense counsel disagreed with the Commonwealth's assertion that he planned the attack and attempted to conceal his culpability afterward.[1] Counsel acknowledged that Wesley had appreciated that his attack on Carrington was wrong. However, defense counsel asserted that recently enacted Code § 19.2-271.6[2] gave "the [c]ourt an alternative way of dealing with these cases" involving mental illness and impulsive behavior. Defense counsel explained:

---

[1] The Commonwealth agreed that Wesley had demonstrated that he suffered from a mental disease or defect.

[2] Under Code § 19.2-271.6, effective on July 1, 2021,

> [i]n any criminal case, evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted if such evidence (i) tends to show the defendant did not have the intent required for the offense charged and (ii) is otherwise admissible pursuant to the general rules of evidence.

> Whereas, previously when the presentation of mental health evidence would occur, it would only be in the context of insanity and the only decision the [c]ourt could use that evidence to support was a ruling on sanity or insanity, but not used towards the individual's intent.
>
> The statute expressly allows it now. They are attacking these kinds of crimes using this statute for that purpose. This gives an alternative remedy to judges or to juries in the decision on these cases not to have to make a ruling based on a somewhat archaic insanity law that has not been updated in a hundred years. This allows for a third option or a fourth option. So, guilt, not guilty, not guilty by insanity and then reducing the charge based on a lack of intent.

Defense counsel continued, "That's what I ask the [c]ourt to do in this case." He asserted that the mental health evidence the defense presented proved that Wesley did not possess the necessary criminal intent for the crimes. Defense counsel concluded,

> We are, at this time, not specifically asking for a certain outcome so to speak. I don't think I'm comfortable standing here and saying I know Mr. Wesley wants not guilty by reason of insanity acquittal. I don't think people want to be acquitted by reason of insanity. Even if it's true, I don't think people want that.
>
> I think insanity acquittals are a dangerous avenue, at least based on the understanding I've gotten from more wise attorneys than I, who have had clients locked up in a hospital for thirty years based on something that happened.
>
> And that's a fear that's outside of the [c]ourt's control. I mean, once the acquittal occurs, it goes into a separate process for which the [c]ourt does not retain much authority over it.
>
> And so, that's the fear of these kinds of pleas, and so the hope that I have for the resolution of this case and for Mr. Wesley is that an outcome can be crafted in such a way that affords Mr. Wesley the opportunity to continue in the treatment that's been . . . recommended by numerous sources -- which is . . . intensive

---

Code § 19.2-271.6(B). To establish the underlying mental condition, a defendant must prove that it "satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association." *Id.* "[R]ather than create a new affirmative defense, Code § 19.2-271.6 permits defendants to introduce evidence of a mental condition that previously would not have been permitted under the common law." *Calokoh v. Commonwealth*, 76 Va. App. 717, 732 (2023).

> outpatient treatment with medication and multiple disciplinary
> teams.

The trial court struck the charge of abduction, but convicted Wesley of aggravated malicious

wounding and strangulation. This appeal followed.

ANALYSIS

I.

Wesley challenges the sufficiency of the evidence to sustain his conviction for aggravated

malicious wounding, contending that Carrington did not sustain a permanent and significant

injury.[3] "On review of the sufficiency of the evidence, 'the judgment of the trial court is

presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v.*

*Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

*Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support

for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its

opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v.*

*Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App.

273, 288 (2017)).

Under Code § 18.2-51.2(A), any person who "maliciously shoots, stabs, cuts or wounds

any other person . . . with the intent to maim, disfigure, disable or kill" is guilty of aggravated

malicious wounding "if the victim is thereby severely injured and is caused to suffer permanent

and significant physical impairment." As used in the statute, a "physical impairment" is "any

---

[3] Though Wesley conceded at oral argument that his first assignment of error pertaining to this issue was barred and subsequently abandoned that assignment of error, his fifth assignment of error also raises this same issue.

physical condition, anatomic loss, or cosmetic disfigurement." *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010) (quoting *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995)). "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve, but instead can leave it to the common sense of the [fact finder] to determine if the injuries are permanent." *Id.* at 644-45. This Court has found that scarring may constitute a significant and permanent physical impairment. *See Hawkins v. Commonwealth*, 64 Va. App. 650, 654 (2015).

In the brutal and unprovoked attack, Carrington suffered a concussion and other injuries on her head, face, neck, arms, and legs. She had nerve damage to a hand that took several months to heal. Carrington's medical treatment included twenty-eight staples to close a wound on her head and sutures to her mouth. At the time of Wesley's trial, Carrington had a scar on her forehead, which she exhibited to the trial court, from the attack. She also stated that she had scars beyond her hairline that remained sensitive to the touch. Upon this evidence, a reasonable finder of fact could conclude beyond a reasonable doubt that Carrington sustained a permanent and significant injury to support Wesley's conviction for aggravated malicious wounding.

## II.

In four assignments of error, Wesley claims that the trial court erred in denying his motions to strike and convicting him of aggravated malicious wounding and strangulation "after the defendant established by a preponderance of the evidence that he was insane at the time of the offense." Wesley asserts that his "insanity was the result of an irresistible impulse." He

maintains that the trial court erred in finding him guilty because "he was insane at the time of the offenses" and should have found him "not guilty by reason of insanity."[4]  We disagree.[5]

"In Virginia, unlike many jurisdictions, insanity is an affirmative defense that the defendant must establish to the satisfaction of the fact finder."  *Brown v. Commonwealth*, 68 Va. App. 746, 795 (2018) (quoting *Shifflett v. Commonwealth*, 221 Va. 760, 769 (1981)).  "The defendant bears the burden of proving the defense by a preponderance of the evidence."  *Id.* (citing *White v. Commonwealth*, 46 Va. App. 123, 129 (2005) (en banc)); *see also Taylor v. Commonwealth*, 208 Va. 316, 322 (1967) ("In Virginia, every man is presumed to be sane until the contrary is made to appear and when insanity is relied upon as a defense in a criminal prosecution, it must be proved by the defendant to the satisfaction of the [fact finder].  This does

---

[4] To the extent that Wesley asserts that the evidence of his mental health condition demonstrated that he lacked criminal intent, this claim is not encompassed within his assignments of error, which allege only that he "was insane at the time of the offense."  "Only assignments of error listed in the brief will be noticed by this Court."  Rule 5A:20(c)(1).  "Thus, we are 'limited to reviewing the assignments of error presented by the litigant[,]' and cannot 'consider issues touched upon by [Wesley]'s argument but not encompassed by his assignment of error.'"  *Riddick v. Commonwealth*, 72 Va. App. 132, 146 (2020) (first alteration in original) (quoting *Banks*, 67 Va. App. at 289).  Considering recently enacted Code § 19.2-271.6, this Court found that the statute "does not provide individuals with a qualifying mental condition 'an excuse or justification for what would otherwise be criminal conduct.'"  *Calokoh*, 76 Va. App. at 731 (quoting *Foley v. Commonwealth*, 63 Va. App. 186, 200 (2014)).  Instead, "[p]resenting evidence of a qualifying mental condition" under the statute may constitute "a denial of an essential element of the offense."  *Id.* (quoting Ronald J. Bacigal & Corinna Barrett Lain, *Criminal Procedure* § 17:32 (2022-2023 ed.)).  With this new evidentiary rule abrogating the common law rule that "precluded all evidence of a defendant's mental state unless the defendant raised an insanity defense," "a defendant may now raise an insanity defense, or, short of that, satisfy the requirements of Code § 19.2-271.6."  *Id.* at 732.  Thus, a defense of insanity is distinct from a claim that there was proof that a defendant lacked criminal intent based upon evidence admitted under Code § 19.2-271.6.  *See id.*  Applying Rule 5A:20(c)(1), we do not consider any argument that the evidence failed to prove he possessed criminal intent.

[5] The Commonwealth argues on appeal that Wesley's assignments of error on this issue are procedurally barred, given his trial counsel's statements made during closing argument.  Because we hold that the trial court's findings regarding Wesley's asserted defense of insanity do not constitute plain error, we do not address the Commonwealth's argument.  *See Moore v. Joe*, 76 Va. App. 509, 517 n.2 (2023) (noting that the Court "must 'decide cases "on the best and narrowest grounds available"'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

not shift the ultimate burden of proof which rests upon the Commonwealth to prove the commission of the alleged offense beyond a reasonable doubt.").

"Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule[6] and the irresistible impulse doctrine." *Vann v. Commonwealth*, 35 Va. App. 304, 313 (2001) (quoting *Bennett v. Commonwealth*, 29 Va. App. 261, 277 (1999)). "The irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Id.* (quoting *Bennett*, 29 Va. App. at 277).

Wesley contends that he proved his irresistible impulse under this test as a matter of law because the trial court "received sufficient evidence of . . . Wesley's mental disease to satisfy his burden of [proof] . . . to establish that he was insane at the time of the offense[,] [t]he Commonwealth provided no rebuttal evidence in response to . . . Wesley's defense, and the credibility of . . . the defense witnesses was never called into question." We disagree. Notwithstanding the fact that the Commonwealth did not present any expert testimony of its own, the Commonwealth provided evidence of Wesley's state of mind during and directly after the incident that illustrated he was not suffering from an irresistible impulse. A reasonable fact finder could have come to the conclusion that he possessed the ability to resist the impulse to attack Carrington, but instead chose to commit the crimes he did of his own volition.

---

[6] The M'Naghten test, stated in the disjunctive, requires the following:

> [I]t must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

*Price v. Commonwealth*, 228 Va. 452, 457 (1984) (quoting *M'Naghten's Case*, 10 Cl. & F. 200, 210, 8 Eng. Rep. 718, 722-23 (1843)). Wesley did not advance a defense of insanity under the M'Naghten Rule, instead relying solely on an irresistible impulse defense.

"The word impulse implies that which is sudden, spontaneous, unpremeditated." *Vann*, 35 Va. App. at 314 (cleaned up) (quoting *Rollins v. Commonwealth*, 207 Va. 575, 580 (1966)). "Acting on an impulse involves no planning; it could occur at any place in the presence of anyone, and further, the lack of restraint inherent in an impulsive act is inconsistent with a contemporaneous concealment of the impulsive act." *Id.* (citing *Rollins*, 207 Va. at 580). Here, the Commonwealth presented evidence of substantial planning and preparation by Wesley. He called in absent from work the morning of the attack. He drove to a nearby parking lot and left his keys in the ignition of his vehicle. He brought gloves with him, which he dropped after the attack. The first time Wesley passed his victim, he kept his head down so she would not see his face. Wesley wore a medical mask even though he was outside, which further obstructed the view of his face. He allowed Carrington to pass him, before following her to a more remote location—the fitness loop. And he waited for her to exit the loop before he ambushed her.

Wesley also engaged in certain behavior after the attack that indicated an effort to conceal his crimes. *See Clagett v. Commonwealth*, 252 Va. 79, 93-94 (1996) ("Flight following the commission of a crime is evidence of guilt" and "includes the taking of any action . . . intended to disguise one's identity and distance oneself from the crime."). Wesley removed certain outer garments after the attack. When he encountered law enforcement, he sought to avoid them and then lied about why he was in the area.[7] Further, as the Commonwealth points out, Wesley's phone calls that he made from jail demonstrate his decision-making at the time of

---

[7] As fact finder, the trial court "was at liberty to discount [Wesley]'s self-serving statements as little more than lying to conceal his guilt[] and could treat such prevarications as affirmative evidence of guilt." *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (internal quotation marks and citations omitted). Further, a fact finder, having rejected a defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt. *Emmett v. Commonwealth*, 264 Va. 364, 372 (2002).

the incident. Wesley called himself "stupid" for the way he got caught and lamented that he had been outside the police "perimeter" and then was spotted when he returned.

"The irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Vann*, 35 Va. App. at 313 (quoting *Bennett*, 29 Va. App. at 277). "While the defendant is 'able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, [he] is unable, because of such mental disease, to resist the impulse to do it.'" *Khine v. Commonwealth*, 75 Va. App. 435, 450 (2022) (alteration in original) (quoting *Thompson v. Commonwealth*, 193 Va. 704, 717 (1952)). "The defendant 'bears the burden of proving the defense [of insanity] by a preponderance of the evidence.'" *Id.* at 449 (alteration in original) (quoting *Brown*, 68 Va. App. at 795).

Here, the fact finder "was free to reject [Wesley]'s evidence and find that he failed to prove his insanity defense." *Brown*, 68 Va. App. at 796. A reasonable fact finder, based on the evidence presented by the Commonwealth of Wesley's planning and concealment, could have rejected Wesley's insanity defense. Because its fact finding was not plainly wrong or without evidence to support it, the trial court did not err in denying the motions to strike.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*