COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Ortiz and Senior Judge Annunziata
Argued at Fairfax, Virginia


CATALIN FILIPEANU

v.        Record No. 1315-22-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE DANIEL E. ORTIZ
OCTOBER 10, 2023


FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge

Daniel H. Goldman (Law Office of Daniel Goldman, PLLC, on
briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The trial court convicted Catalin Filipeanu of maiming while driving under the influence

and sentenced him to 10 years' incarceration with all but 180 days suspended.  On appeal, Filipeanu

challenges the sufficiency of the evidence to sustain his conviction.  Because the evidence was

sufficient, we affirm the trial court's judgment.

BACKGROUND[1]

Around 10:00 p.m. on January 4, 2021, Filipeanu began drinking beer in his apartment.

Over the next four hours, Filipeanu consumed "four or five beers" and a glass of port.  Around

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."  *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

2:30 a.m., Filipeanu took alprazolam (also known as Xanax) to help him sleep.[2]  Filipeanu then fell asleep.

Filipeanu awoke around 9:30 a.m. on January 5 and began working on a scientific paper.[3]  However, he struggled to write, and because his progress was very slow, he decided to take an afternoon nap.  For this nap, Filipeanu drove to a grocery store to purchase a twelve-pack of beer, leaving his apartment around 1:45 p.m.  After purchasing that beer, Filipeanu returned to his vehicle in the parking lot, put it in gear, and—without checking his surroundings—touched the gas pedal.  Although Filipeanu intended to drive forward, he put his vehicle in reverse.  Filipeanu "got scared" when his car began moving backwards because he knew the parking lot was busy and was concerned he might hit something.  Filipeanu tried to apply his brakes but instead pressed the gas, causing his vehicle to reverse "at a pretty high speed."

At this precise moment, Robert Cox was loading groceries into his car, which was parked behind Filipeanu's SUV.  As Cox was facing the trunk of his car, he was "slammed" against his car and "collapsed."  There was "a lot of confusion and commotion," but Cox knew that he had been "badly injured."  Nawidullah Jalaly and Lorilyn Cabe were in the parking lot and witnessed these events.  Jalaly immediately approached the SUV and offered to help Filipeanu.  When Filipeanu refused, Jalaly called the police.  After returning to the scene, Jalaly saw that Cox was on the ground, "pleading for help" and "bleeding so bad."  His legs appeared "amputated," and blood was "streaming down."  Meanwhile, Filipeanu remained in his SUV and appeared "like he was in shock."  "[H]is head was leaning back toward the seat, like he was tired."

---

[2] In 2013 and 2015, a Romanian doctor prescribed Filipeanu this alprazolam to treat his depression.  Filipeanu also suffered from "chronic insomnia."

[3] In January 2021, Filipeanu was an associate professor of pharmacology.  As such, he studied "how drugs work and affect the body"—including the central nervous system—and was thus "aware of how Xanax affects the body."

Police and emergency personnel arrived within five minutes. Elizabeth Honaker, a paramedic, realized this was "a critical situation" after seeing "a large pool of blood" and noticing that one of Cox's legs was twelve feet from his body. Honaker approached Cox to apply tourniquets and render aid, but Filipeanu was "standing over top of him." Filipeanu had his "legs spread over top of [Cox's] head," and was "staring down at [Cox]." Honaker repeatedly instructed Filipeanu to move, but he "just gave [her a] blank stare." Honaker seized Filipeanu's arm and moved him away.

Although Cox was responsive, he was cold and pale from blood loss. Honaker and another paramedic provided emergency treatment to stop the bleeding and secure any spinal injuries, but Filipeanu tried to insert himself "in the middle of the situation," and the paramedics kept "removing him until the police arrived." Eventually, they transported Cox to a trauma center via ambulance. In transport, they started "fluid resuscitation" and administered ketamine for pain relief. Cox ultimately survived but spent six weeks in the hospital and lost both legs.

While the paramedics treated Cox and transported him to the hospital, Officer Benjamin Saks talked to Filipeanu, who was "staring at the ground," "disoriented," and "unstable on his feet." Officer Saks asked Filipeanu who he was, what happened, and if he had been driving the SUV. Filipeanu's speech was slurred, and he "just kept staring at the ground." When Filipeanu gave Officer Saks his driver's license, Filipeanu said that he just tried to "drive straight." Realizing Filipeanu might be intoxicated, Officer Saks asked him if he had eaten or drunk anything that day. Filipeanu "said no" but admitted that he had taken alprazolam.

Officer Vitale arrived and took over the DUI investigation. Despite wearing a mask, Officer Vitale "smelled a lot of alcohol" on Filipeanu and testified that Filipeanu swayed and slurred his speech. Filipeanu initially denied consuming any alcohol that day but later admitted that his last drink was at 2:00 a.m. Officer Vitale led Filipeanu to a flat, level surface of the parking lot to

administer field sobriety tests.  Filipeanu was unable to complete the horizontal gaze nystagmus test because he failed to follow Officer Vitale's instructions.  On one attempt, he did not move his eyes or head; on another attempt, he turned his head rather than following with his eyes; and on the third attempt, he "wasn't following . . . at all."  On the walk-and-turn test, Filipeanu could not hold the starting position and started walking before being instructed to do so.  He did not "make any heel to toe connection[s]" and did not walk on a line.  After taking nine steps, he did not turn as instructed but "just shuffled his feet around."  Finally, on the one-leg stand test, Filipeanu lifted his leg incorrectly and dropped it to the ground after two seconds.  He then "in quick succession" repeatedly lifted his foot and returned it to the ground.  He could not stand during the test and "flail[ed]" his arms to maintain balance.

Officer Vitale arrested Filipeanu forty minutes after arriving.  Officer Saks then drove him to the hospital while Officer Vitale obtained a search warrant for a sample of his blood.  An hour later, Officer Vitale arrived at the hospital with the search warrant, and a nurse took the sample.  Subsequent forensic analysis revealed four positive results: 0.106% by weight by volume for ethanol; 0.033% by weight by volume for acetone, a ketone found in nail polish remover; 0.021% by weight by volume for isopropanol, or rubbing alcohol; and 0.021 milligrams per liter of alprazolam.

After having Filipeanu's blood sampled, the police transported Filipeanu to the police station and interviewed him.  During this interview, Filipeanu admitted that, during the prior night, he had consumed a glass of port, "four Heinekens," and alprazolam.  Regarding the accident, Filipeanu admitted to not being aware of his surroundings and "put[ting] the shift in the wrong direction."  Throughout the interview, Filipeanu continued to slur his speech and even struggled to drink water from a bottle (e.g., drooling and spilling water on the table).  Immediately after the

interview, Police executed a search warrant at Filipeanu's apartment, finding beer cans all over the floor[4] and recovering over 130 alprazolam tablets.

At trial, Dr. Kevin Schneider, a forensic toxicologist with the Department of Forensic Science, testified that ethanol is a central nervous system depressant that "acts on the brain and the central nervous system somewhat like a dimmer switch." The general side effects include confusion, difficulty focusing, reduced muscle coordination and balance, and slower movements, thoughts, and actions. Although severity of the side effects varies depending on the individual, Dr. Schneider opined that Filipeanu's blood alcohol level could have impaired his ability to estimate speeds or react to "external stimuli" while driving. Dr. Schneider also explained that acetone and isopropanol had similar side effects, including "decreased . . . brain and central nervous system functionality." Both acetone and isopropanol are more potent than ethanol, with acetone being "much more" potent.

Dr. Schneider further explained that alprazolam was also a central nervous system depressant that resulted in "sleepy, drowsy, slow, lethargic reactions, potentially slurred speech, things of that nature." The alprazolam level in Filipeanu's blood was in the "low therapeutic" range but could "still have side effects," particularly if an individual was not regularly taking alprazolam.[5] Indeed, because ethanol and alprazolam are both central nervous system depressants, their effects were "additive" and more "severe when both are present." Dr. Schneider acknowledged that diabetic individuals can have acetone in their blood if they have too much glucose and not enough

---

[4] A picture of this search shows approximately forty-eight empty beer cans. Filipeanu explained that the empty cans were an accumulation of the four to seven beers that he consumed daily between December 29, 2020 and January 4, 2021.

[5] Although Filipeanu initially took alprazolam every day, he stopped doing so because it made him "too sleepy" and "not function[] well." Moving forward, Filipeanu only took the alprazolam "once a month, or sometimes not even once a month."

insulin.[6]  He also acknowledged that ingestion of either acetone or isopropanol would cause both to appear in the blood stream because "the body processes one into the other."

Walter Grimes, a fleet services supervisor for the City of Alexandria, inspected Filipeanu's SUV and determined that its brakes were in "good condition" and nothing would have caused it to operate "other than the way it was designed to."  Senior Trooper Walter Reel, testifying as an expert in crash data retrieval analysis, stated that he also examined Filipeanu's SUV and extracted the event data recorder.  Trooper Reel determined that the SUV's speed was zero miles per hour five seconds before the accident.  Within three seconds, it accelerated to twenty-two miles per hour.  During that time, the gas pedal was "jammed to the floor."  About one second before the collision, the throttle reduced from "100 percent to zero."

Charles Simpson, testifying for Filipeanu as an expert in car accident reconstruction and event data recorders, opined that, if the car was out of gear, the car's gas pedal would not have to be pressed to the floor to register that percentage of throttle.  Simpson further opined that the event data from Filipeanu's SUV was consistent with "pedal error"—i.e., mistakenly placing one's foot on the gas pedal instead of the brake.  Simpson agreed that Filipeanu removed his foot from the gas pedal one second before the collision.  At Filipeanu's request, the trial court took judicial notice of three federal government publications indicating, among other things, that forty-four accidents per day in the United States are caused by pedal error, and over half of those accidents occur in parking lots.

When the Commonwealth rested, Filipeanu moved to strike the Commonwealth's evidence. Filipeanu argued that the Commonwealth failed to prove that his conduct was "so gross, wanton, and culpable as to show a reckless disregard for human life."  Filipeanu said that, besides having a blood alcohol content slightly above the legal limit, the Commonwealth had not offered any other

---

[6] During trial, Filipeanu never suggested that he either had diabetes or was suffering from a diabetic episode when the blood sample was taken.

evidence of such "reckless disregard." And Filipeanu contended that intoxication alone cannot prove such recklessness. The trial court denied the motion to strike, stating that Filipeanu's alcohol consumption, drug consumption, and manner of operating his motor vehicle showed his reckless disregard for human life.

After resting his case, Filipeanu renewed his earlier motion to strike, incorporating his earlier arguments. The trial court again denied that motion. The court found that the combination of substances in Filipeanu's blood rendered him intoxicated. The court also found that Filipeanu mistakenly shifted his SUV into reverse because he was intoxicated. Moreover, the trial court found that, while he intended to stop the car, Filipeanu mistakenly pressed the gas pedal instead of the brake. The trial court found that such conduct was "the definition of gross, wanton, and culpable conduct that evidenced . . . reckless disregard for human life." Consequently, the trial court found Filipeanu guilty of maiming while driving under the influence and sentenced him to 10 years' incarceration with all but 180 days suspended.

Filipeanu appeals his conviction and argues that, while his actions may constitute ordinary negligence, the evidence failed to establish that he was criminally negligent. Filipeanu contends that he cannot be imputed with knowledge that he was driving while intoxicated because he testified that he did not think he was intoxicated while driving and the "trial court made no contrary finding." Moreover, he maintains that because his BAC was "only marginally above the limit," the Commonwealth was required to prove "a separate grossly negligent act or omission to establish criminal liability." And he asserts that his driving behavior was not grossly negligent because he "made an unfortunate error," which he tried to rectify by removing his foot from the gas pedal before the collision.

## ANALYSIS

### I. Standard of Review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Lucas v. Commonwealth*, 75 Va. App. 334, 342 (2022) (quoting *McGowan*, 72 Va. App. at 521).

### II. Sufficiency of the Evidence

The trial court found Filipeanu guilty of maiming while driving under the influence in violation of Code § 18.2-51.4(B). To convict someone under that provision, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) drove while intoxicated, (2) drove "in a manner so gross, wanton, and culpable as to show a reckless disregard for human life," and (3) "unintentionally cause[d] the serious bodily injury of another person resulting in permanent and significant physical impairment." Code § 18.2-51.4(B). On appeal, Filipeanu only argues that the Commonwealth failed to prove the second element.

To prove this second element, the Commonwealth must show that the defendant was criminally negligent. *Riley v. Commonwealth*, 277 Va. 467, 483 (2009). Negligence is criminal

> when accompanied by acts . . . of a wanton or wilful nature, showing a reckless or indifferent disregard of the rights of others under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable results of his acts.

*Rich v. Commonwealth*, 292 Va. 791, 802 (2016) (quoting *Riley*, 277 Va. at 484). In determining whether one is criminally negligent, a court should "consider the cumulative effect of a series of connected, or independent negligent acts, out of which arise the injuries." *Bell v. Commonwealth*, 170 Va. 597, 609 (1938).

The Commonwealth cannot "prove *criminal* negligence as a matter of law" by the "mere happening of an accident, coupled with evidence that the offender had been drinking and that the accident was his fault." *Wyatt v. Commonwealth*, 47 Va. App. 411, 418 (2006). However, "intoxication is . . . relevant to a determination of the degree of the defendant's negligence." *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 283 (1984)). A defendant's level of intoxication thus "may serve to elevate the defendant's conduct to the level of 'negligence so gross, wanton, and culpable as to show a reckless disregard of human life.'" *Essex*, 228 Va. at 283 (quoting *King v. Commonwealth*, 217 Va. 601, 607 (1977)); *Wood v. Commonwealth*, 57 Va. App. 286, 292-94, 301 (2010) (holding that driving with a BAC three times the legal limit "alone justifies a finding of gross, wanton, and culpable conduct").[7] And when assessing a defendant's intoxication, a court can

---

[7] A defendant's intoxication while driving can rise to criminal negligence because such "driving is not only unlawful in itself, but it tends to make the defendant's dangerous conduct more dangerous." *Essex*, 228 Va. at 283. "A sober but reckless driver may rely on his skill and prompt reflexes to extricate himself from any emergency created by his reckless driving." *Id.* But a "drunken driver has dulled his perceptions, blunted his skill, and slowed his reflexes in advance." *Id.* Consequently, the "same reckless driving is more dangerous at his hands than it would be if he were sober, and his conduct is therefore more culpable." *Id.*

consider any "self-administered intoxicant or drug of whatever nature, or any combination of such drugs, . . . which impairs his ability to drive." *Ratliff v. Commonwealth*, 53 Va. App. 443, 446-47 (2009) (quoting Code § 18.2-266); *see, e.g.*, *Riley*, 277 Va. at 484.

Consistent with these principles, the Supreme Court upheld a DUI maiming conviction when the defendant's BAC was 0.13 and she struck a man who was erratically operating an electric wheelchair in a crosswalk. *Rich*, 292 Va. at 795-96, 802-03. The defendant had two hours of sleep the previous night and had taken her eyes of the road seconds before the collision to have her intoxicated passenger light her cigarette. *Id.* at 796. The Supreme Court found that the defendant's elevated BAC, poor performance on field sobriety tests, and inattentiveness demonstrated that she had acted with "a reckless or indifferent disregard for the safety of others" and was thus criminally negligent. *Id.* at 802-03.

Here, Filipeanu's BAC was similarly high, measuring 0.106 *hours after* the accident. In addition, Filipeanu had acetone, isopropanol, and therapeutic levels of alprazolam in his blood. That cocktail of central nervous system depressants had an "additive" effect, resulting in a more "severe" reduction in his coordination, balance, reaction times, movements, and thoughts. Indeed, immediately after the accident, Filipeanu remained in his SUV with his head leaned back toward the seat. After paramedics arrived, he awkwardly stood over Cox's legless body and blankly stared at Honaker as she repeatedly instructed Filipeanu to move so that she could administer life-saving treatment. Later, when talking to the police, Filipeanu was disoriented, unstable on his feet, and "stared" at the ground. He also failed each field sobriety test by not following basic instructions and flailing his arms to maintain balance. Filipeanu stated that he only drank four or five beers and a glass of port the previous evening and was "not feeling bad" when he drove to the grocery store. However, the trial court was entitled to disbelieve that self-serving testimony and conclude that he was "lying to conceal his guilt." *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998).

- 10 -

While heavily intoxicated from the combination of alcohol, alprazolam, acetone, and isopropanol in his blood, Filipeanu drove in a grocery store parking lot, where many pedestrians were walking to and from their vehicles. Indeed, Filipeanu admitted that he was not aware of the vehicles around him and "got scared" when his SUV reversed because the parking lot was so busy. Due to his intoxication, however, Filipeanu's attempt to brake resulted in him stepping on the gas so hard that, within seconds, he was travelling twenty-two miles per hour in reverse. Moreover, these depressants slowed his reaction times such that he kept his foot on the gas for seconds. Indeed, Filipeanu never braked, and his SUV pinned Cox against his own car, amputating his legs. Thus, Filipeanu's decision to drive in a busy parking lot while so heavily intoxicated supports a finding that his series of negligent acts rose to the level showing a reckless disregard of human life. *Essex*, 228 Va. at 283.

Filipeanu's reliance on *Coomer v. Commonwealth*, 67 Va. App. 537 (2017), is misplaced. In *Coomer*, this Court reversed the defendant's felony child neglect conviction after she collided with a car while her BAC was 0.10 and her children were in the back seat. 67 Va. App. at 550-52. Because the defendant drove below the speed limit on a wet and curvy road and no car was damaged, the Court found that the defendant's intoxication standing alone was insufficient to demonstrate criminal negligence. *Id.* at 547, 551-52. Importantly, the responding officer testified that the defendant was not "severely impaired." *Id.* at 550.

Here, although Filipeanu's BAC was similar to Coomer's, it was measured hours after the accident. Moreover, the effects of the alcohol in Filipeanu's system were exacerbated by the additional central nervous system depressants in his blood. Moreover, the defendant in *Coomer* attempted to avoid an accident by driving below the speed limit and "reacted quickly enough to avoid a serious accident." *Id.* Filipeanu, however, did not take any actions to avoid an accident and was so intoxicated that he could not properly react after realizing his SUV was reversing.

Thus, the evidence in this case was sufficient to support a finding that Filipeanu acted with criminal negligence.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*